## Burns v. Lackey.

## Graves v. Wallace, et al.

## Marton v. Same.

(Decided June 16, 1916.)

### Appeals from McCracken Circuit Court.

1. Elections—Contest—Parties.—Where there are eight candidates for commissioner in a city governed under the commission form of government and only four commissioners are to be elected, and no one of the eight is a candidate for any particular commissionership, in a contested election case one of those who is conceded to have been fairly elected is not a necessary party to the contest, the only question being which one of the parties to the contest, who were candidates for commissioner, received the highest number of legal votes.

2. Elections—Intimidation—Threats.—Where fourteen hundred members of a secret political organization have taken a solemn oath signed in blood that they will obey the political orders of one man, and the evidence shows that the great mass of them believed they were legally and morally bound by this oath, and the evidence shows that at the election they did so obey his orders, and that at meetings of the organization held shortly before the election they were directed and drilled by this man as to how they should vote, and there is other evidence of intimidation and threats, there was such intimidation as will prevent a free election within the meaning of the constitution.

3. Elections—Intimidation—What May Constitute.—It is not necessary under our statute to constitute intimidation that physical violence should be used, or that there should be threats against person or property. Intimidation may be practiced by other means.

4. Elections—Intimidation.—Our government is builded upon the rights and duties of the individual, and any organization which has for its purpose the abdication by the individual of his sovereignty and the granting and giving by him to another of the exercise of his duties of citizenship, strikes at the foundation of the whole structure and cannot be tolerated.

5. Elections—Intimidation.—An election can not be free and equal where approximately thirty per cent. of the electors are not at liberty to cast their votes according to their own volition and judgment because of coercion growing out of their membership in an unlawful organization wherein they had taken an oath to submit to the political domination of another and cast their votes as he may direct rather than in accordance with their own judgment and conviction.

6. Elections—Intimidation.—When thirty per cent. of the voters at an election have been intimidated, and there is no way of ascer-

taining how they would have voted if they had not been, and the returns show the election to have been close, the court under our statute, has no alternative except to treat the election as void.

JOHN K. HENDRICKS, L. H. CROSSLAND, DAVID BROWNING and F. N. BURNS for appellants.

BERRY & GRASSHAM, W. A. BERRY, JAMES CAMPBELL, JR., HAZELIP & KAHN and OSCAR KAHN for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

Paducah is a city of the second class and is being governed under what is known as the commission form of government, as is authorized by statute.

The statute contemplates a non-partisan municipal government, and provides that every fourth year a non-partisan primary shall be held prior to the regular election at which two candidates for mayor may be nominated and eight candidates for the four commissioners to be elected at the ensuing election may be nominated, and the persons so nominated shall be entitled to have their names printed on the official ballot at the succeeding election.

At the November election 1915, a mayor and four commissioners were to be elected under this system, and at the primary previously held, F. N. Burns and Ernest Lackey, having received the highest number of votes in the primary for mayor were declared the nominees for that office and their names were printed on the official ballot; at the same primary Don. F. Marton, Geo. C. Wallace, C. L. VanMeter, Thos. N. Hazelip, Wynn Tulley, L. A. Washington, E. E. Graves and W. A. Gardner, having received the highest number of votes were declared nominees for commissioner and their names were printed on the official ballot at the ensuing election.

Under the statute at the regular election the four nominees for commissioner receiving the highest number of votes shall be declared elected, and it will be observed from this that no one of the eight is a candidate for any particular commissionership, nor is any one of them running as a candidate against any other particular one, but on the contrary each one of the eight is a candidate against the other seven, there being only four such places to be filled.

At the regular election something less than five thousand votes were cast and the canvass of the returns showed that Lackey had received for mayor 2,563 votes and Burns had received 2,305, and accordingly a certificate of election was issued to Lackey; the returns further showed that Wallace, for commissioner, received 2,741 votes; Hazelip, 2,602; Van Meter, 2,413; Washington, 2,443; Marton, 2,349; Tulley, 2,343; Graves, 2,340, and Gardner, 2,142, and accordingly certificates of election were issued to Wallace, Hazelip, Van Meter and Washington.

Burns brought his action against Lackey contesting his election to the office of mayor, and Graves and Marton brought their separate actions against Wallace, Hazelip and Van Meter contesting their rights, severally, to the office of commissioner, and alleging that they each (Graves and Marton) had received more legal votes at said election than either of said defendants. It will be observed that Washington, one of those declared elected, is not a party to any of these suits and his right to the office of commissioner is not called in question; further that neither Gardner nor Tulley, who were defeated on the face of the returns is a party to these actions.

The lower court consolidated the three actions and heard them together, and upon final judgment dismissed the petitions of each of the contestants and they have appealed.

All three appeals present practically the same questions and will be considered together.

The petitions in the three cases in their essential features are the same, and in order to present what we conceive to be the controlling question in the case, we herewith copy from the petition in the Burns v. Lackey case, as follows:

"Plaintiff states that during the year 1914 there was formed in the city of Paducah, McCracken county, Kentucky, a secret political organization known as the 'United Protective Association'—formed and promoted by Thomas N. Hazelip, Mayor of Paducah, and others, which said organization was and is composed of negro voters, the names and members of which are to this plaintiff, in the main, unknown; that about ninety per cent. of the negro voters of Paducah belong to said organization; that the purposes and objects of said or-

ganization were secret and political in their nature, and organized for the purpose of controlling elections in the city of Paducah through the domination and control and manipulation of the negro votes in said city, and was gotten up and organized by Thos. N. Hazelip for said purposes, and after its organization was completely controlled, directed and voted under the dictation of said Hazelip. That the by-laws and laws and constitution of said United Protective Association are as follows, to-wit:

### THE CONSTITUTION, LAWS AND BY-LAWS OF THE UNITED PROTECTIVE ASSOCIATION.

"Section 1. This association shall be known as the United Protective Association and shall be composed of male citizens of Paducah, Kentucky, having the qualifications of legal voters.

### OBJECTS AND BENEFITS.

"Section 2. The objects of the creation and organization of this association shall be to combine male persons of legal qualifications as voters into a secret fraternal and benevolent order for the purpose of self protection and political preferment as citizens of this city, county and Commonwealth and for the further purpose of social entertainment and intellectual culture.

### OFFICERS AND THEIR DUTIES.

"Section 3. There shall be and there is hereby created the office of chief counselor and adviser, and Thomas N. Hazelip is hereby designated such officer so long as this organization shall exist or so long as he shall choose to fill said office during the existence of this association.

"There shall be elected by a majority vote of members in good standing of each post hereafter organized, a president, vice-president, a secretary, a sergeant-at-arms and a treasurer.

"(1) It shall be the duty of the president to preside over all meetings of the post at which he is present.

"(2) It shall be the duty of the vice-president to preside over all meetings in the absence of the president.

"(3) It shall be the duty of the secretary to keep a book with the records of the names of all members

of the post and to keep the minutes of each meeting and the transactions of the post.

"(4) It shall be the duty of the treasurer to safely keep all moneys belonging to the post and to collect and disburse same at the direction of the post and to keep a correct account of same.

"(5) It shall be the duty of the sergeant-at-arms to maintain order at all times and if necessary to expel persons from the post who are disorderly or who cannot give the pass-word and who are not entitled to remain àt the secret meetings of the post.

"(6) It shall be the duty of the sentry to keep the door at all times and only to admit those during secret meetings who are members in good standing and who are able to give the pass-word before entering the councils of said association. Said officers with the exception of the chief counselor and adviser shall be elected for a term of one year and shall hold their offices until their successors are elected, provided, however, that if any officer shall die or resign during his term of office, a successor to him shall immediately be elected by the members of the post.

"All questions of appeal on the by-laws and constitution or the rights of members of the different posts, or expulsion of same, or suspension shall be appealed to the chief counselor and adviser.

### APPLICATION.

"Section 4. Application for membership with this order shall be made to the post located nearest to the applicant's place of residence. Applications must be made in writing and in form prescribed by the chief counselor and advisor. There shall be no fee charged as an entrance fee and no dues except as may be voted by the posts and each post shall govern itself upon this question absolutely.

### BENEFITS.

"Section 5. Whereas this organization is political in its aspect, each post is given the right to designate by ballot from its members the persons who will be used by the organization to work in elections at polling places and in fact all political work and will further send delegates to a meeting to be held with delegates from other posts and select from the membership of this organiza-

tion persons to fill in places open and subject to appointment by public officers or other institutions employing men where such recommendations are asked for.

### OATH.

"Section 6. Each member upon being admitted into this organization will be required to subscribe to an oath to carry out both political and otherwise the instructions given him by a majority of members of his post and the directions of the chief counselor and adviser.

### MEMBERSHIP.

"Section 7. The application of members other than charter members of this organization will be passed upon by secret ballot and any person receiving less than two-thirds of the votes of the members present will not be accepted into this organization.

### DIVISION A.

"Each post shall meet at least once each month, the time and date to be fixed by the posts and special meetings may be called by the president as often as is expedient.

### DIVISION B.

"The chief counselor and adviser shall visit said post at least once every sixty (60) days and shall furnish the pass-word once in each six months (6) months and said pass-word shall not be at any time mentioned outside the hall of meeting place and shall be held secret and sacred at all times.

### DIVISION C.

"The oath and pledge shall not be administered by any one save and except the president of the post and shall not be mentioned or referred to at any time except by said president of said posts.

### DIVISION D.

"I do solemnly affirm and swear that I will at all times obey the orders of the chief counselor and adviser and the orders of the majority of my post, and that I will never at any time speak ill of any of my fellow associates or their families, that I will keep sacred all the acts and doings of this association, that I will not divulge the pass-word, this oath, or any other thing pertaining to the acts and doings of this organization.

"I further affirm and swear that I will be loyal to this association, its members, its orders and acts, and that never until death will I divulge or tell anything, order or business connected in the slightest manner with this organization.

"I do now seal this oath with my signature in the presence of the officers and members of this post in blood, and swear that only death will separate me from this organization or its secrets, so help me God."

"Plaintiff states that said Thos. N. Hazelip and the other members of this United Protective Association, and certain other persons, conspired among themselves and with other confederates (for brevity hereinafter called conspirators) whose names are unknown to the plaintiff, to control elections in the city of Paducah, and to prevent free, fair and equal elections in said city, and that said conspirators conspired and agreed and confederated and bound themselves together to prevent a free, fair and equal election of a mayor and commissioners of said city on November 2, 1915, and conspired to procure the apparent and pretended election of Ernest Lackey as mayor of said city, and pretended election of George C. Wallace, Thos. N. Hazelip and C. L. Van Meter as commissioners of said city; that said Thos. N. Hazelip associated with him and conspired with George C. Wallace, Wynn Tulley and C. L. Van Meter to elect themselves, to-wit: The said T. N. Hazelip, George C. Wallace, Wynn Tulley and C. L. Van Meter, commonly known as the 'Big Four,' and hereinafter designated and referred to as the 'Big Four'—as commissioners of the city of Paducah.

"Plaintiff states that each and all of the voters belonging to the aforesaid United Protective Association took the aforesaid oath and after taking same were under the complete domination and control of said Thos. N. Hazelip, as chief counselor and adviser, and thereafter voted as directed by said Hazelip, and that they voted against this plaintiff in obedience to the dictation and direction of said Hazelip, and through said methods and domination a free, equal and fair election was prevented.

"That after said Lackey became a candidate for said office of mayor, that he became a party to and connived with the said organization and its members, conspirators and candidates for commissioners, herein set forth, and

conspired to procure his election to said office of mayor, regardless of whether he might or might not receive a majority of the legal votes cast in said city for said office; and the said conspirators conspired and bound themselves together and confederated to procure the election of the aforesaid candidates as commissioners and said Ernest Lackey as mayor of the city of Paducah, by means of fraud, intimidation, bribery and violence, and by using money, illegally, wrongfully and improperly to influence the voters; that said Thos. N. Hazelip has been mayor of the city of Paducah since 1911 and an intense republican; and that for a long time prior to said registration and election he was a strong and active worker for the political interest of said Ernest Lackey and the 'Big Four.' That said Thos. N. Hazelip is the chief counselor and adviser of said United Protective Association, and that said association has upwards of 1,400 members; that under the by-laws and oath of said organization, each member thereof became obligated and bound to 'carry out both political and otherwise the directions of the chief counselor and adviser,' and to support such candidate or candidates as said Hazelip would indicate and instruct or order them to support and vote for; that said Hazelip instructed, ordered and directed said members of said United Protective Association to support and vote for Ernest Lackey for mayor of the city of Paducah and the 'Big Four' as commissioners, and the members of said United Protective Association did so vote as dictated and directed by said Hazelip in said election, all of which is contrary to section 6 of the Constitution of Kentucky which declares that 'all elections shall be free and equal,' and all of which is further repugnant and contrary to the principles of republican form of government and especially contrary to elections under commission government, which, under the law, are made nonpartisan.  *    *    *

"He further states that the said United Protective Association was composed principally of ignorant, uneducated negroes, who were required to take an oath and to sign their names to said oath in blood, agreeing to the laws, constitution and by-laws of said organization and the rules and regulations made in pursuance thereof, and that the members of the said United Protective Association obligated and bound themselves to surrender

their right to the free exercise of suffrage, and bound and obligated themselves to obey the behest, orders, instructions and dictation of the said Thos. N. Hazelip, and to vote at any and all elections which might be held only for such persons as the said Thos. N. Hazelip might designate for them, and bound and obligated themselves not to vote for any one for any office or position to be filled at any election except as indicated and directed by the said Hazelip, and that all of the members of the said United Protective Association did carry out and keep their oaths and obeyed the behest of the said Thos. N. Hazelip in said particular, and the said Hazelip, through his said unlawful, illegal acts, and by directing said members of said club or organization how to vote, completely deprived the members of the right to cast their vote for any person except such as might be designated by the said Thos. N. Hazelip, and by so doing he violated the right of free and equal suffrage, and violated the constitution and laws of the state of Kentucky, and bound each and all of said members to violate the same, under his command and direction, and they did violate the same, under his command and direction, and they did violate the constitution by so submitting themselves to the dictation of the said Hazelip; that the said combination and organization of said club, under oath, was a conspiracy against free, equal and fair elections, and a conspiracy against the constitution and laws of the state of Kentucky, and said conspirators and members of said club were each and all voted under the direction and dictation of the said Hazelip and that at the November election in 1915 each and all of said members of said club were prevented from exercising the right of suffrage, and each and all of said members voted in violation of law, against their will, for the said Ernest Lackey for mayor and the 'Big Four' for commissioners, and, under the direction of said Hazelip, voted for Ernest Lackey and the 'Big Four' and against this plaintiff, against their will, and were all so forced and compelled, under their oaths and under the rules and by-laws of said organization, to vote for George C. Wallace, C. L. Van Meter and Thos. N. Hazelip.''

In an amended petition the plaintiff gives the names of about 1,000 negro voters who belonged to the United Protective Association, and who, under the control and

dictation of Hazelip, as set forth in his original petition, all voted for Lackey.

The answer put in issue all of the material allegations above quoted, except there is no sufficient denial that the negro voters named in the amended petition had voted for Lackey; but there is denial that any of them belonged to the United Protective Association at the time of the election, and it is alleged at that time there was no such organization in existence.

It was also alleged in the petition that Hazelip in order to consummate and carry out his unlawful purpose to dominate the city election in Paducah, on the registration dates prior to the election, stationed persons at each of the registration places in the precincts where the negro vote was registered and directed the said persons so stationed to take up and hold the registration certificates of each and every negro voter, and that said persons so stationed did take up such registration certificates and put them into a locked box especially prepared for that purpose, and that each and all of the colored voters whose certificutes were so placed in said box were members of the United Protective Association, and that after said certificates were so procured they were taken possession of by Hazelip and his lieutenants and kept by them until election day, at which time they were re-delivered to the voters as they appeared at the polls to cast their votes; all of which is conceded, but is claimed to have been done for the purpose of preserving the certificates and for the convenience of the voters and with their acquiescence.

Each of the plaintiffs, after praying to be adjudged to have been legally elected, prayed in the alternative that if the court should be of opinion that there was such fraud, intimidation, bribery or violence as made the election void, that it be so adjudged.

The first question to be determined is whether Washington was a necessary party to these contests, and whether, therefore, the motions of the defendants to dismiss the actions because of a defect of parties should have been sustained. About this question there is little difficulty; it is conceded throughout the record and by all parties that Washington was elected. He was not on the "Big Four" or the Hazelip ticket and was in no sense a beneficiary of any intimidation that may have been practiced through the organization and manipula-

tion of the United Protective Association; on the contrary it is shown that he was elected in spite of, and not on account of, this organization and the use made of it.

Under the pleadings in this case, so far as the commissionerships are concerned, the court had before it, not the question whether Washington had been elected, but, first, which one of the three among the five parties who were candidates for commissioner and parties to these actions received the highest number of legal votes; and second, whether the record discloses the intimidation of such a number of the voters as makes it uncertain which ones of the five did receive the highest number of votes, so that it become the duty of the court, under our statute, to declare the election void as to these three commissionerships.

Manifestly it would be the duty of the court, if Washington was a party to these actions, under the record as it stands, to declare that he was elected.

The two remaining questions are: First, does the record disclose such a state of fact as will enable the court to say with any degree of certainty that any of the parties to these suits received enough legal votes cast by a free and untrammelled electorate to authorize a judgment that any of them received more such votes than the other; and second, was there such intimidation growing out of the organization of the United Protective Association, the oath which its members took and the dominion which Hazelip acquired over its members because of the oath, to authorize the court to adjudge that because of such intimidation and dominion the election was void?

There was a great mass of evidence taken as to the organization and operation of the United Protective Association, and it was given chiefly by members of that organization; from the nature of the oath which they had taken and their fidelity to that organization, it is apparent that it was taken under great difficulties and that it was by no means easy to get at the inside facts. However, it may be stated that the weight of the evidence shows the following facts: That the United Protective Association was organized in 1914; that Hazelip, at the time mayor of Paducah, was its chief counselor and advisor under its constitution and by-laws; that its constitution and by-laws were as set forth in the

petition above quoted; that its membership consisted of about 1,400 negroes and that Hazelip was the only white man who was a member of it; that the membership of 1,400 represented about ninety per cent. of the negro voters of Paducah; that they were each required to and did take the oath shown by the constitution and by-laws when they became members; that in the fall of 1914 a copy of the constitution and by-laws of the United Protective Association, as above recited, was found on the streets of Paducah and was shortly thereafter published in full in a newspaper of that city; that after such publication and in the spring of 1915, doubtless with the purpose of escaping any further odium that might attach to said organization by reason of such publication, there was organized another negro club by the organization of which it was attempted to create the impression that the United Protective Association had been dissolved; but as a matter of fact the evidence shows the United Protective Association was not dissolved, that its organization continued, that it took in new members in the year of 1915 and held meetings at different times throughout that year up to the election; it further shows, by a photograph in the record taken after the election in 1915, that there was a sign in large letters on the building where the United Protective Association lodge met as follows, "Negro U. P. A. Lodge Hall;" it is shown at these meetings that Hazelip was generally present, that he directed the members whom they should vote for in the approaching election, that they were directed to vote for the "Big Four"; that the names of the "Big Four" and Lackey were called over by him and the members were required to repeat their names after him, and they were thoroughly drilled as to the men they were to vote for.

About twenty-five or thirty of the members of the United Protective Association testified in this case for appellants, and it is apparent throughout their testimony that most of them were very reluctant to give any evidence about this organization; in fact many of them declined to answer questions, declined to give the password, and refused to give certain other information with reference to the activities of Hazelip in the management of this organization; but from detached portions of the evidence it is perfectly apparent that the great mass of these ignorant and superstitious members

of this organization regarded themselves as both legally and morally bound by the blood oath which they had taken, not only not to divulge the secrets of the organization, but to vote as they were directed to vote by their chief counselor and adviser. Likewise there are references to certain threats made by Hazelip and other officers and members of the organization if any of the members divulged secrets or failed to comply with the oath; it is shown that it was talked among the members that if they violated their oath they would not be seen around Paducah any more, that they would be sent ''up yonder,'' meaning the Eddyville penitentiary; that it would not be good for any member to divulge the secrets; that Hazelip said that ''You boys must stick to your oaths, and any one giving away these secrets will be attended to or run out of town,'' and that one man was notified and left the town; that the members felt that after they had sworn to do anything that they had to do it. The record further discloses certain threats made against the members of the organization if they gave evidence in these contests; in fact the very first member of this organization who was introduced as a witness by the appellants at the very inception of the evidence, was informed by Hazelip, who was present, that the United Protective Association was a secret order and that he did not have to answer questions concerning it, and there are other evidences of intimidation by him during the taking of depositions.

It is true that several of the witnesses stated on cross-examination that they knew they were not legally bound by this oath, but the evidence as a whole is convincing that the great mass of the members of this organization considered themselves bound, both legally and morally, by the oath they had taken.

Summarizing, we have a secret political organization of 1,400 negroes, many of whom are ignorant and superstitious; we have each of them subscribing to an oath in blood that he will obey the orders of the chief counselor and adviser and carry out, both political and otherwise, the directions of such official; we have meetings held by this organization shortly before the election wherein the chief counselor and adviser reminds the members of their oath and tells them to vote for certain candidates at the approaching election and drills them so as they may carry out his orders effectually; we have

the great mass of these members fully imbued with the idea that they are bound by and must follow this oath; we have unmistakable evidence that at the election the great mass of them did vote for the men the chief counselor and adviser directed them to vote for; we have threats made not only by the chief counselor and adviser but by other officers and members of the organization intended to intimidate any member of it who divulged its secrets or who did not comply with its oath.

In short, it is sufficient to say that no conscientious man earnestly seeking the truth can read this record without being convinced that Hazelip absolutely dominated this organization and the great mass of its ignorant and superstitious membership, and through the machinery of this club and the oath which its members had taken, controlled their suffrage and had them vote as he desired, and not in the exercise of their own free and untrammelled suffrage.

It must not be overlooked that not only did Hazelip have these ignorant and superstitious voters bound by this vicious blood oath, not only did he have them in fear that they might be punished or run out of town if they violated it, but when the election of 1915 was held, in addition to all of that, he had the registration certificates of practically every member of this organization in his custody and control without which they could not vote, he at the time being not only the chief counselor and adviser, the supreme dictator of this organization, "the King of the Negroes of Paducah" as he boasted, but he was then mayor of the city and a candidate for commissioner at the approaching election.

It must be further borne in mind that this was essentially a non-partisan election; that the political parties, as such, did not participate in it; that the two nominees for mayor were each Democrats and that the eight nominees for commissioner were divided between the political parties, and that the election was held under a statute passed primarily for the purpose of divorcing municipal elections from party politics; and it is therefore unreasonable to assume that the members of this organization, whatever may have been their party politics, would have voted with such unanimity as this record discloses, independent of the dominion acquired over them through this organization and the oath which they were required to take.

Section 6 of the Constitution of Kentucky says:

"All elections shall be free and equal."

And the last paragraph in section 150 says:

"The privilege of free suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult or *other improper practices.*"

It is provided in section 1596a Kentucky Statutes, dealing with the subject of contested elections, in sub-section 12, that:

"In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the court of appeals finally, may adjudge that there has been no election."

There is no claim that physical violence was practiced at the election, or that any voter who was not in the ordinary sense a legal voter cast a ballot; the whole contention is that through the machinery of this secret political organization and by reason of the oath which its members were required to take, and because of the subsequent threats and acts of intimidation of the organizer and dictator of this association and his lieutenants, that the members thereof were deprived of the right to cast their ballots according to their own free and untrammelled will. In other words that there was such intimidation within the meaning of our statute as prevented a free and equal election within the meaning of the constitution.

We must inquire then first whether the facts which we have recited above amount to intimidation, or must there be physical violence used before it can be said, under our statute, that intimidation has been practiced. The case of Hocker v. Pendleton, 100 Ky. 726, was a contest over the validity of a local option election; in that case, out of a voting population of one hundred and seventy-five, sixty legal voters were prevented from voting solely because the ballots furnished by the clerk were exhausted. The court, in discussing whether or not it was a free and equal election, said:

"The question whether or not an election has been 'free and equal' in a constitutional sense (constitution, section 6) has usually arisen in cases where by force,

intimidation or the like, a considerable proportion of the electorate has been deprived of the right of suffrage.

"It is clear, however, that an election may be free from violence, and yet, if from a failure of the officers to supply ballots, booths, stencils, etc., any large proportion of the electors is prevented from voting, it can properly be said there has not been a free and equal election within the meaning of the constitution."

Intimidation has been defined to be "putting in fear." Pray v. Pray, 128 La. 1037; Johnson v. State, 1 Ga. App. 729. It is not necessarily limited to threats or violence to person or property; the simple request to do or not to do a thing made by one or more of a body of strikers made under circumstances calculated to convey a threat or intimidation in violation of an injunction against the use of such means is no less obnoxious than the use of physical violence for the same purpose; there may be a moral intimidation independent of threats or violence or physical injury. Lohse Patent Door Co. v. Fuelle, 22 L. R. A. (N. S.) 607 (Mo.); Allis-Chalmers Co. v. Iron Moulders' Union, 150 Fed. 155; Begelahn v. Guntner, 35 L. R. A. (O. S.) 722 (Mass.); Union Pac. R. Co. v. Ruef, 120 Fed. 119; Baldwin v. Escanaba Liquor Dealers Asso., 165 Mich. 98.

McCreary on Elections, in his chapter on statutory regulation, in speaking of intimidation and of the necessary provisions against it in such statutes, at section 680 says:

"It is scarcely necessary to say that no statute regulating elections can be complete without containing ample provision for the prevention of every species of intimidation of voters, whether by violence, the exhibition of force, threats, or other means. * * * The law should be so framed as to guard with scrupulous care the perfect freedom of the ballot, and every attempt to rob even the poorest and weakest elector of his free choice should be regarded as a high crime, since the rights of all are involved in the question of the protection of the rights of each."

The case of Patton v. Coates, 41 Ark. 111, was an election contest wherein there were charges of fraud, intimidation and coercion, and that therefore the election in certain precincts was not free and equal. The court in discussing that question, said:

"Yet it cannot be said that elections are 'free and equal' where fraudulent combinations for illegal voting override honest votes, or where fear deters from the exercise of free will, although there may be no turbulence. It would be to encourage such things, as the ordinary machinery of political contests, to hold that they shall only avoid to the extent their influence can be computed. It seems clear that courts must abnegate the power of preserving the freedom of elections, and abandon the polls to the violent and unscrupulous; or must take the ground, that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught. The evils of an occasional success of a minority, if that should sometimes happen in the effort to sustain the fundamental principle of our government, would be but temporary, and in any case would be but slight, in comparison with the subversion of free government, which would surely follow the continued practice of rendering the freedom of elections a mockery."

If, then, intimidation may be practiced by means other than physical force, or threats against person or property, can it be doubted that the contestants in this case have established it on a wholesale scale?

They have shown the organization of this unlawful association, the primary purpose of which was to deprive the individual voter of the right guaranteed to him by law to cast a free and untramelled ballot in accordance with his own conscience and his own opinion of what was best for him and the public, having induced him through a false conception of fraternalism to take a solemn oath in the sight of God and man that he would renounce this great privilege and grant to another the right to dictate how his ballot should be cast; they have shown that the dominion so obtained over the voter through this oath was continued and emphasized until the election of 1915 through various threats and other forms of intimidation; they have shown that these superstitious members of that organization believed themselves to be legally and morally bound by the oath which they had taken; they have shown that this man, whose orders the members have sworn to execute, directed them in meetings held shortly before the election how and for whom they should vote, and drilled them so that

no mistake might be made in the execution of his orders, and they have shown by the result of the election in the precincts of Paducah where the heavy negro vote is cast that they stood by their oaths and followed his directions in this non-partisan election.

But there is something deeper and more serious in this case than even this insidious, and, therefore, most vicious and dangerous, intimidation.

The brain that conceived this organization could not have been highly trained in the true spirit of American institutions.

The organization and its purpose are repugnant to all the fundamental ideas upon which our government is based. The whole governmental structure is builded upon the rights and duties of the individual and any organization which contemplates the abdication by the individual of his sovereignty and the granting or giving over to another by him of the exercise of his duties of citizenship, necessarily strikes at the foundation of the whole structure and cannot be tolerated.

The very fact that these 1,400 voters took a solemn oath to vote as Hazelip might dictate, together with the evidence that most of them did, is sufficient to vitiate the election; especially when we consider the ignorance and superstition of the voters thus imposed upon.

However, nothing in this opinion is to be deemed a criticism of legitimate organizations for political purposes, or local non-political organizations designed to better local conditions. On the contrary such organizations are to be encouraged; they frequently result in either educating the people on great public questions, or locally call attention to abuses and bring about their correction.

But such organizations are in nowise akin to the one in question; the one has in view the public betterment by the education of the people on public questions and by directing attention to abuses; the other strikes at the very root of our institutions by taking from the individual his right to cast his vote according to his own judgment and opinion, and concentrating the voting power of a large number of electors in one man.

We need hardly say that an election cannot be free and equal where approximately thirty per cent. of the electors are not at liberty to cast their votes according to their own volition, judgment and conscience and be-

cause of the coercion growing out of their membership in an unlawful organization wherein they have taken an oath to submit to the political domination of another, and to cast their votes as *he* may order rather than in accordance with their own judgment and conviction.

We have not treated as serious the contention of appellants that they should be adjudged elected. It is too clear for argument that when thirty per cent. of the voters at an election have been intimidated and there is no way of telling how they would have voted if they had not been, and that the election is close as shown by the returns, that the court under our statute above quoted has no alternative except to treat the election as void.

The judgment is reversed with directions to enter judgment declaring the election void as to the offices involved in these suits.

Whole court sitting.