RENDERED: DECEMBER 14, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0522-TG

DERRICK GRAHAM; JILL ROBINSON;            APPELLANTS
JOSEPH SMITH; KATIMA SMITH-
WILLIS; KENTUCKY DEMOCRATIC
PARTY; AND MARY LYNN COLLINS

ON MOTION TO TRANSFER

V.         COURT OF APPEALS NO. 2022-CA-1403
FRANKLIN CIRCUIT COURT NO. 22-CI-00047

SECRETARY OF STATE MICHAEL           APPELLEES
ADAMS; COMMONWEALTH OF
KENTUCKY; AND KENTUCKY STATE
BOARD OF ELECTIONS

AND

2023-SC-0139-TG

COMMONWEALTH OF KENTUCKY           CROSS-APPELLANT

ON MOTION TO TRANSFER

V.         COURT OF APPEALS NO. 2022-CA-1451
FRANKLIN CIRCUIT COURT NO. 22-CI-00047

DERRICK GRAHAM; JILL ROBINSON;           CROSS-APPELLEES
JOSEPH SMITH; KATIMA SMITH-
WILLIS; KENTUCKY DEMOCRATIC
PARTY; KENTUCKY STATE BOARD OF
ELECTIONS; MARY LYNN COLLINS;
AND MICHAEL ADAMS, IN HIS
OFFICIAL CAPACITY AS SECRETARY
OF STATE OF THE COMMONWEALTH
OF KENTUCKY

**OPINION OF THE COURT BY JUSTICE BISIG**

**<u>AFFIRMING</u>**

> While the judiciary should protect the rights of the people with great care and jealousy, because this is its duty, and also because, in times of great popular excitement, it is usually their last resort, yet it should at the same time be careful not to overstep the proper bounds of its power, as being perhaps equally dangerous . . . .

*Miller v. Johnson*, 92 Ky. 589, 18 S.W. 522, 523 (1892).

This appeal requires us to carefully balance our strong reluctance to adjudicate political questions with our solemn duty to consider claims that enactments of the General Assembly violate our Kentucky Constitution. The legislative apportionment statutes at issue are a tableau containing the lines and shapes of critical voting districts whose structures are the product of political inspiration. It constitutes a painting for which our courts possess neither palette nor brush. Regardless of how unusual or eye-raising it may be, we must not erase it unless it plainly leaves the four corners of our constitutional frame. In applying the substantially deferential standard we afford to purely political acts by a coordinate branch of government, we perceive no such constitutional infirmity and thus affirm the trial court's conclusion that the redistricting statutes pass constitutional muster.

## FACTUAL AND PROCEDURAL BACKGROUND

Kentucky's General Assembly is composed of thirty-eight Senators and one hundred House Representatives, each elected from one of the Commonwealth's thirty-eight senatorial and one hundred representative districts, respectively. Ky. Const. §§ 33, 35. Section 33 of the Kentucky Constitution assigns to the General Assembly the task of reapportioning these districts once every ten years for the purpose of accommodating population

2

shifts since the last apportionment, with a pronounced emphasis on the dual objectives of achieving population equality and maintaining county integrity in the crafting of the districts. The General Assembly undertakes a similar task with respect to Kentucky's federal Congressional districts, redrawing those boundaries every ten years pursuant to authority conferred by Article I, Section 4 of the United States Constitution. As with reapportionment of the state legislative districts, the redrawing of the Congressional districts is intended to account for population shifts and requires maintenance of population equality across the districts. *See Evenwel v. Abbott*, 578 U.S. 54, 59 (2016).

In its 2022 legislative session, the General Assembly passed House Bill 2 (HB 2) defining new boundaries for the General Assembly's one hundred House districts and Senate Bill 3 (SB 3) defining new boundaries for the Commonwealth's six Congressional districts.[1] Governor Beshear vetoed both HB 2 and SB 3 (collectively, the Apportionment Plans). The General Assembly overrode the vetoes and enacted the Apportionment Plans with immediate effect. Later in the session, the Democratic minority introduced House Bill 191 (HB 191) as an alternative House redistricting proposal. That bill was unsuccessful, although its proposed maps are instructive in analysis of the issues presented in this appeal.

Appellants are the Kentucky Democratic Party (KDP), Democratic State House Representative Derrick Graham, and four Kentucky voters. They filed

---

[1] The General Assembly also passed Senate Bill 2 defining new boundaries for the General Assembly's Senate districts. Appellants do not challenge that statute.

the present action in Franklin Circuit Court against Secretary of State Adams and the Kentucky State Board of Elections alleging that the Apportionment Plans violate the Kentucky Constitution. Attorney General Daniel Cameron intervened as a Defendant on behalf of the Commonwealth.

Before the trial court, Appellants alleged that HB 2 violates Section 33 of the Kentucky Constitution by splitting counties, adding portions of one county to another county, and including three or more counties in a single district more times than necessary to achieve population equality among the districts. Appellants also asserted the Apportionment Plans are the result of partisan gerrymanders violating Kentucky's constitutional guarantees of free and equal elections, equal protection, freedom of speech and assembly, and freedom from arbitrary government action. *See* Ky. Const. §§ 1, 2, 3, & 6. The Commonwealth filed a counterclaim and crossclaim seeking a declaration that use in a future election of prior legislative apportionment maps enacted in 2012 and 2013 would be unconstitutional.

After denying preliminary motions for injunctive relief and to dismiss the case, the trial court held a three-day bench trial beginning April 5, 2022. At trial, Appellants presented proof that HB 2 splits counties a total of eighty times, while Democrats' competing HB 191 plan splits counties only sixty times. Appellants also showed that HB 2 includes forty-five districts composed of one portion of a county added to another county, while HB 191 includes only thirty-one such districts. Appellants' proof further demonstrated that HB 2 includes thirty-one districts composed of three or more counties, while HB 191

4

includes only twenty-three such districts and simulated alternative maps on average include twenty-four such districts. Appellants thus argued that HB 2 violates Section 33 by splitting counties, adding portions of one county to another, and forming districts from more than two counties more times than necessary to achieve population equality.

In support of their claim that the Apportionment Plans are also unconstitutional partisan gerrymanders, Appellants presented expert Dr. Kosuke Imai who testified that a comparison of HB 2 with ten thousand simulated alternative maps demonstrates HB 2 is an effort to make Republican-leaning districts safer while reducing the Democratic advantage in Democratic-leaning districts. Dr. Imai also testified HB 2 results in more Republican-leaning districts while reducing Democratic-leaning districts. According to Dr. Imai, this is accomplished in part by the combining of Democratic voters in urban areas with suburban and rural Republican voters to create Republican-leaning districts. Plaintiffs also presented testimony from expert Dr. Devin Caughey that his analysis of certain metrics showed HB 2 to be highly partisan in favor of Republicans.

Dr. Imai also testified that SB 3's First Congressional District is uncompact, stretching from Fulton County in far western Kentucky all the way to Franklin County in north-central Kentucky. According to Dr. Imai, this District's 35% Democratic vote share is lower than 99% of his ten thousand simulated alternative maps.

5

The Commonwealth presented testimony by experts Sean Trende and Dr. Stephen Voss that the metrics interpreted by Appellants' experts as an indication of partisan gerrymandering are better understood as a natural result of Kentucky's political geography.[2] Trende also ascribed the unusual shape of the First Congressional District to an effort by the General Assembly to protect the Second Congressional District for former Congressman William Natcher, who died in 1994.

Additional evidence at trial showed that Republicans would be expected to win about seventy-seven House seats under Democrats' proposed HB 191. The trial court also received proof it would be impossible to apportion Kentucky's Congressional seats such that Democrats might reasonably expect to win more than a single seat. Commonwealth expert Trende also pointed out that Democrats would gain no Congressional seats under one-seventh (14.3%) of the simulated alternative maps used as comparators by Dr. Imai.

Appellants also presented lay witness testimony at trial from KDP Political Director Trey Heineman and Representative Graham. This testimony was to the effect that the Apportionment Plans have negatively impacted the ability of Democrats to recruit candidates, fundraise, obtain volunteer support, and negotiate with members of other parties in the General Assembly. Plaintiff voter Jill Robinson also testified that placement of Franklin County in the First Congressional District interferes with the ability of Franklin County citizens to

---

[2] The term "political geography" means the political and geographic features that are specific to each state, including spatial distribution of voters and configuration of administrative boundaries.

obtain effective representation and exert influence given significant social, political, and economic differences between Franklin County and western Kentucky.

The 2022 elections were conducted under the Apportionment Plans. The results of the elections were that Republicans won 80 seats in the State House and Democrats won the remaining 20 seats. Several incumbent Democratic State Representatives were defeated by Republican challengers. Republicans also won five of Kentucky's six seats in the U.S. House of Representatives, with a Democrat elected to the single remaining seat.

In a thorough and well-written Opinion and Order issued shortly after the 2022 election, the Franklin Circuit Court found that the constitutionality of the General Assembly's apportionment plans is a justiciable question and that Appellants have standing to pursue their claims. The trial court further found that the Apportionment Plans are partisan gerrymanders, but that the consideration of partisan interests in the apportionment process does not violate the Kentucky Constitution. The trial court also held that the Apportionment Plans do not violate Section 33 of the Kentucky Constitution because they comply with the dual mandate for redistricting set forth in *Fischer v. State Board of Elections*, 879 S.W.2d 475 (Ky. 1994) (*"Fischer II"*). Finally, because it thus found the Apportionment Plans constitutional, the trial court concluded the Commonwealth's crossclaim and counterclaim seeking a prohibition against use of the 2012 and 2013 district maps in future elections was moot.

7

Appellants appealed and the Commonwealth cross-appealed. We granted transfer of the appeal and cross-appeal from the Court of Appeals pursuant to Rule of Appellate Procedure 17(C), designated both matters to be heard together, and heard oral argument on September 19, 2023.

## ANALYSIS

Appellants allege two fundamental errors by the trial court. First, Appellants contend that while the trial court correctly determined the Apportionment Plans are the result of partisan gerrymandering, it incorrectly concluded that partisan gerrymandering does not violate the Kentucky Constitution. Second, Appellants also contend the trial court erred in finding that the Apportionment Plans' unnecessary deviations from the requirements of Section 33 do not render them unconstitutional.

In considering these contentions, we review the trial court's findings of fact for clear error. *Welch v. Commonwealth*, 563 S.W.3d 612, 615 (Ky. 2018). That is, we "must determine 'whether or not those findings are supported by substantial evidence.'" *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72 (Ky. 2010) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). Substantial evidence is "'[e]vidence that a reasonable mind would accept as adequate to support a conclusion,' or evidence that 'has sufficient probative value to induce conviction in the minds of reasonable men.'" *Id.* (citations omitted).

We review the trial court's conclusions of law, including determinations of constitutionality, *de novo*. *Teco/Perry Cnty. Coal v. Feltner*, 582 S.W.3d 42, 45 (Ky. 2019). In cases such as this involving a challenge to the

8

constitutionality of a duly enacted statute, we begin with a strong presumption that the statute is constitutional. *Fischer II*, 879 S.W.2d at 475. Moreover, because this case involves allegations that the General Assembly's apportioning of Congressional districts violates our Kentucky Constitution, we remain mindful of the U.S. Supreme Court's recent guidance on the proper role of state judiciaries in considering compliance of Congressional district reapportionment plans with state constitutional law:

> State courts retain the authority to apply state constitutional restraints when legislatures act under the power conferred upon them by the Elections Clause. . . . In interpreting state law in this area, state courts may not so exceed the bounds of ordinary judicial review as to unconstitutionally intrude upon the role specifically reserved to state legislatures by Article I, Section 4, of the Federal Constitution.

*Moore v. Harper*, 600 U.S. 1, 143 S. Ct. 2065, 2089-90 (2023). With these precepts in mind, we turn now to the merits of this appeal.

## I. Appellants Have Standing To Pursue Their Claims.

As a preliminary matter, we consider whether Appellants have standing to bring their claims. Under the separation of powers enshrined in our Kentucky Constitution, the courts of this Commonwealth consider only "justiciable causes." Ky. Const. § 112(5) ("The Circuit Court shall have original jurisdiction of all *justiciable causes* not vested in some other court.") (emphasis added); *Commonwealth, Cabinet for Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton*, 566 S.W.3d 185, 197 (Ky. 2018) ("[T]he *justiciable cause* requirement applies to cases at all levels of judicial relief."). That is, we consider only claims the adjudication of which falls properly within our judicial

function.  Examples of *non*-justiciable claims beyond the purview of our judicial function include those seeking an advisory opinion, requesting adjudication of a claim that is moot or not ripe, or presenting a political question inappropriate for judicial determination.  *Sexton*, 566 S.W.3d at 193.

Another example of a non-justiciable claim is one the plaintiff lacks standing to pursue.  *Id.*  At its core, standing is concerned with whether a plaintiff sufficiently alleges redressable injury fairly traceable to the defendant's allegedly unlawful conduct such that adjudication of the claim would be a proper exercise of our judicial authority.  *See id.* at 192-97.  "[E]xistence of a plaintiff's standing is a constitutional requirement to prosecute any action in the courts of this Commonwealth."  *Id.* at 188.  All Kentucky courts thus "have the responsibility to ascertain, upon the court's own motion if the issue is not raised by a party opponent, whether a plaintiff has constitutional standing, an issue not waivable, to pursue the case in court."  *Id.*

We employ a three-factor test for considering whether a plaintiff satisfies the constitutional requirement of standing:

> [F]or a party to sue in Kentucky, the initiating party must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, and (3) redressability.  In other words, "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  "[A] litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent . . . ."  "The injury must be . . . 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'"  "The injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision."

10

*Id.* at 196 (citations omitted). Additionally, generalized grievances are insufficient to confer standing upon a plaintiff. That is, "[a] public wrong or neglect or breach of a public duty cannot be redressed in a suit in the name of an individual whose interest in the right asserted does not differ from that of the public generally, or who suffers injury only in common with the general public." *Lexington Retail Beverage Dealers Ass'n v. Dep't of Alcoholic Beverage Control Bd.*, 303 S.W.2d 268, 269-70 (Ky. 1957).

In the present case, the trial court concluded each of the Appellants has individual standing to pursue their claims. The trial court also found that the KDP has associational standing to pursue the claims. We agree on both counts.

First, Appellants have shown injury as required to support individual standing. Appellant Representative Graham testified at the bench trial that the Apportionment Plans negatively impact his ability to recruit Democratic candidates, to raise funds for elections, and to affect policy and conduct negotiations in the General Assembly. Appellant Robinson is a Kentucky citizen, taxpayer, and voter who testified that SB 3 deprives her of a meaningful opportunity to petition her Congressional Representative. Similarly, Appellants Collins, Smith-Willis, and Smith allege that they are Kentucky citizens, taxpayers, and voters, and that the Apportionment Plans interfere with their interest in translating their votes into representation under fair and constitutional apportionment plans. Appellant KDP alleges injury arising from the Apportionment Plans' negative impact on recruiting, electing, and retaining

11

candidates and affecting policy-making and negotiations in the General Assembly. As such, the standing requirement of actual, concrete, and particularized injury is satisfied as to each Appellant. Moreover, Appellants' claims rest upon allegations of individual injury rather than mere "injury only in common with the general public," and thus are not impermissibly premised on merely generalized grievances. *See id.*

Second, the Appellants also satisfy the causation requirement of standing insofar as they allege their injuries result from the Apportionment Plans' intentional dilution of the power of Democratic votes. Finally, Appellants' claims satisfy the redressability requirement given their request for injunctive and declaratory relief holding the Apportionment Plans unconstitutional. Thus, because Appellants each satisfy the standing requirements of injury, causation, and redressability, we agree with the trial court's conclusion that the Appellants have individual standing to pursue their claims.

We further agree with the trial court's determination that the KDP has associational standing to assert claims on behalf of its members. Associational standing allows an association to "establish standing to assert a claim on behalf of its members despite the lack of an injury to the association, itself." *City of Pikeville v. Kentucky Concealed Carry Coalition, Inc.*, 671 S.W.3d 258, 264 (Ky. 2023). Under Kentucky law, "an association may have standing to assert a claim on behalf of its members 'only if its members could have sued in

their own right.'"[3]  *Id.* (quoting *Bradley v. Commonwealth ex rel. Cameron*, 653 S.W.3d 870, 879 (Ky. 2022)).

We have previously set forth the quantum of proof required for an association to demonstrate that its members could sue in their own right, depending on the procedural posture of the case:

> At the pleading stage, less specificity is required. At that point, an association may speak generally of the injuries to "some" of its members, for the "presum[ption] [is] that general allegations embrace those specific facts that are necessary to support the claim." By the summary judgment stage, however, more particulars regarding the association's membership must be introduced or referenced. Finally, before a favorable judgment can be attained, the association's general allegations of injury must clarify into "concrete" proof that "one or more of its members" has been injured. "By refus[ing] to come forward with any such showing," any claim to associational standing, and the potential for success on the merits is forfeited.

*Id.* at 265 (quoting *Commonwealth ex rel. Brown v. Interactive Media Ent. & Gaming Ass'n, Inc.*, 306 S.W.3d 32, 39-40 (Ky. 2010)).  Here, the trial court issued a final judgment regarding Appellants' claims, and thus to have associational standing KDP must have shown by concrete proof that one or more of its members suffered injury.  KDP need not have shown injury to specifically identified members, but rather could satisfy the member injury requirement by pointing to injuries suffered by its members generally.  *See City*

---

[3] In the federal courts, associational standing also requires additional showings that "the interests [the association] seeks to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  To date, we have not explicitly adopted these additional required showings for associational standing in Kentucky courts. *Id.*

13

*of Ashland v. Ashland F.O.P. #3, Inc.*, 888 S.W.2d 667, 668 (Ky. 1994) (holding that police association had standing because it showed injury to its members, "a majority of the city police."). The KDP made this required showing of member injury by offering testimony at the bench trial that the Apportionment Plans negatively impact the ability of its leaders and members to recruit candidates and dilute the votes of its members. Accordingly, because KDP offered concrete proof of injury to its members, we agree with the trial court's conclusion that KDP also has associational standing.

II.   **Kentucky Courts May Consider The Constitutionality of Apportionment Plans, Including Claims Such Plans Involve Unconstitutional Partisan Gerrymandering.**

A.   **Balancing the Political Question Doctrine and the Judicial Duty of Constitutional Review.**

In addition to lack of standing, a claim may also be non-justiciable if it presents a political question inappropriate for judicial determination. *See Sexton*, 566 S.W.3d at 193. Kentucky courts thus adhere to the political question doctrine, which seeks to preserve the separation of powers by holding "that the judicial branch 'should not interfere in the exercise by another department of a discretion that is committed by a textually demonstrable provision of the Constitution to the other department,' or seek to resolve an issue for which it lacks judicially discoverable and manageable standards." *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 81 (Ky. 2018) (citation omitted).

In applying this political question doctrine, we have declined to consider political questions such as whether delegates to the 1890 Constitutional

14

Convention erred in changing the Constitution before promulgation but after submission of an earlier version for a vote by the people. *Miller*, 18 S.W. at 524 ("If, through error of opinion, the convention exceeded its power, and the people are dissatisfied, they have ample remedy, without the judiciary being asked to over-step the proper limits of its power. The instrument provides for amendment and change. If a wrong has been done, it can, and the proper way in which it should, be remedied, is by the people acting as a body politic."). We have also found political and thus beyond our purview questions regarding the propriety of extension or reduction of town or city boundaries, *Yount v. City of Frankfort*, 255 S.W.2d 632 (Ky. 1953), or the remedy for a political party committee's inability to operate due to deadlock, *Smith v. Howard*, 275 Ky. 165, 120 S.W.2d 1040, 1043 (1938).

Yet while the separation of powers bars our consideration of unduly political questions, it also unquestionably assigns to us the solemn duty of ensuring that the legislative and executive departments do not violate our Kentucky Constitution, even in the exercise of functions or discretion falling within their exclusive domains:

> [U]nder Kentucky's strong separation of powers doctrine, the power to declare a legislative enactment unconstitutional when its enactment violates constitutional principles is solidly within the Court's constitutional authority. . . . "To avoid deciding the case because of 'legislative discretion,' 'legislative function,' etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.

*Bevin*, 563 S.W.3d at 82 (quoting *Rose v. Council for Better Educ.*, 790 S.W.2d 186, 209 (Ky. 1989)). Our exercise of this constitutionally delegated judicial

15

"power to determine the constitutional validity of a statute 'does not infringe upon the independence of the legislature.'" *Id.* at 82-83 (quoting *Stephenson v. Woodward*, 182 S.W.3d 162, 174 (Ky. 2005)). To the contrary, a claim that an act of government is unconstitutional presents a purely *judicial* question appropriate for resolution by the judiciary. *Miller*, 18 S.W. at 523 ("It is our undoubted duty, if a statute be unconstitutional, to so declare it."); *see also Marbury v. Madison*, 5 U.S. 137, 177-78 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. . . . This is the very essence of judicial duty."). Indeed, our Constitution itself commands that each Justice and Judge of this Commonwealth solemnly swear or affirm before taking office that he or she will "support . . . the Constitution of this Commonwealth." Ky. Const. § 228.

What then of cases that present the *judicial* question of whether an inherently *political* act by a coordinate branch of government violates the Constitution? Such claims require us to carefully balance competing considerations. On the one hand, we must remain mindful of our obligation not to resolve political questions and thereby wander unnecessarily beyond the bounds of the proper judicial function into the political thicket inhabited by the legislative and executive branches of government. On the other hand, we must also remain fastidiously faithful to our most solemn duty of guaranteeing that the people remain free of the tyranny that lies in a government unconstrained by constitutional limitations.

16

We have navigated these perilous straits by applying a substantially deferential standard when considering the judicial question of whether an inherently political act of a coordinate branch of government violates the Kentucky Constitution. *City of Lebanon v. Goodin*, 436 S.W.3d 505 (Ky. 2014), provides a useful example. In that case, the plaintiff alleged that the defendant municipality's annexation of property violated Section 2 of the Kentucky Constitution. *City of Lebanon*, 436 S.W.3d at 518. We noted that "annexation is an exclusively political and legislative act." *Id.* We further acknowledged that "[t]he 'complicated and diversified nature of municipal affairs' renders it nearly impossible to govern 'entirely free from the appearance or in fact the reality of favoritism, on the one hand, and discrimination, upon the other.'" *Id.* at 519 (citation omitted). We thus held that "only in extreme cases" would we find that a purely political act of annexation violated Section 2 of the Kentucky Constitution. *Id.* As *City of Lebanon* makes plain, we apply a substantially deferential standard when considering constitutional challenges to political acts by a coordinate branch of government.

## B. Justiciability of Constitutional Challenges to Apportionment Plans

These principles apply equally to claims asserting that a legislative apportionment plan violates our Constitution. The legislative apportionment process is inherently and undeniably political. *Jensen v. Ky. State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997); *see also Rucho v. Common Cause*, 588 U.S. __, 139 S. Ct. 2484, 2497 (2019) ("[D]istricting 'inevitably has and is intended to have substantial political consequences.'") (quoting *Gaffney v.*

17

*Cummings*, 412 U.S. 735, 753 (1973)). Our Constitution explicitly places responsibility for that process with the General Assembly, an elected political body. Ky. Const. § 33. The delegates to the 1890 Constitutional Convention recognized legislative apportionment as a political process, and one in which the judiciary should have as little involvement as possible. Indeed, when the Convention considered assigning responsibility for preparation of an apportionment plan if the General Assembly failed to do so, Delegate Washington of Campbell County argued that responsibility should not fall to the judiciary because apportionment "involves consideration of a more or less political nature" and the "bench should have no stain of politics upon it." Constitutional Debates, Vol. 4, p. 4415 (1890).

Yet while the legislative apportionment process is undoubtedly political, we have also long rejected the argument that the political question doctrine forbids us from taking up the *judicial* question of whether the resulting apportionment plans violate the Kentucky Constitution. As aptly stated more than one hundred years ago,

> The first proposition with which we are confronted is raised by the insistence of appellants, that the question [of the constitutionality of a legislative apportionment plan] involved here is political, and not judicial, and that the courts have not jurisdiction to review the acts of the General Assembly in the matter. To this we cannot agree. It is for the courts to measure the acts of the General Assembly by the standard of the Constitution, and if they are clearly and unequivocally in contravention of its terms, it becomes the duty of the judiciary to so declare. Of course, if the question as to whether or not the legislation is inimical to the Constitution be doubtful, it will always be decided in favor of the constitutionality of the law. But where the matter is plain that the Constitution has been violated, then the courts cannot escape the duty of so declaring whenever the matter is brought to their attention. And

18

> no matter how distasteful it may be for the judiciary to review the acts of a co-ordinate branch of the government their duty under their oath of office is imperative.

*Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865, 866-67 (1907).

We have since been consistent in holding that the constitutionality of a legislative apportionment plan presents a judicial question appropriate for our consideration and not barred by the political question doctrine. For example, in 1931 we noted in a redistricting case that "[i]t is settled that the courts, in a proper case, may interpose for the protection of political rights, and the right to be equally represented in the legislative bodies of the state is not only a political but a *constitutional* right. . . . We entertain no doubt of the right of the plaintiff to invoke the power of the court to protect his *constitutional* rights." *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315, 317-18 (1931) (emphasis added). In 1994, we stated "[a]ny doubt as to this Court's right and duty to review the constitutionality of legislative apportionment was long ago laid to rest." *Fischer II*, 879 S.W.2d at 476. More recently, we reiterated in 2012 that we do not "violate the separation of powers doctrine" in finding a legislative apportionment plan unconstitutional, again because "no matter how distasteful it may be for the judiciary to review the acts of a [coordinate] branch of the government[,] their duty under their oath of office is imperative." *Legis. Rsch. Comm'n v. Fischer*, 366 S.W.3d 905, 911 (Ky. 2012) ("*Fischer IV*") (quoting Ragland 100 S.W. at 867).

Determinations of the constitutionality of apportionment plans are not committed to another branch, but rather fall squarely within the judicial

19

domain: "The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to do so." *Fischer II*, 879 S.W.2d at 476 (quoting *Rose*, 790 S.W.2d at 208). Moreover, the standards we apply are simply the plain language of the Constitution itself and our prior decisions construing that language. *Ragland*, 100 S.W. at 866-67 ("It is for the courts to measure the acts of the General Assembly *by the standard of the Constitution . . . .*") (emphasis added). Thus, we may consider whether legislative apportionment plans violate the equal protection guarantees set forth in Sections 1, 2, and 3, whether they are unconstitutionally arbitrary in violation of Section 2, whether they impermissibly interfere with the guarantee in Section 6 that "[a]ll elections shall be free and equal," whether they impermissibly deviate from the reapportionment requirements set forth in Section 33, or whether they otherwise violate the Kentucky Constitution.

In making such determinations, however, we apply a substantially deferential standard given the political nature of the apportionment process. We begin of course with a presumption that the General Assembly's apportionment plan is constitutional. *Fischer II*, 879 S.W.2d at 475. We then consider not whether the apportionment plan suffers any slight or technical constitutional violation, but rather only whether it involves a substantial deviation from constitutional limitations. *See City of Lebanon*, 436 S.W.3d at 519. For example, we noted in *Watts v. Carter*, 355 S.W.2d 657 (Ky. 1962),

20

that a legislative apportionment plan could "be so *flagrant and unwarranted* that the duty of the courts to uphold the constitutional rights of equality under the law will override their traditional reluctance to enter the political thicket." *Watts*, 355 S.W.2d at 658 (emphasis added). In *Ragland*, we held that a legislative redistricting plan could be declared unconstitutional if it "clearly and unequivocally" violates the terms of the Constitution. 100 S.W. at 866-67. Thus, we will deem an apportionment plan unconstitutional where it involves a clear, flagrant, and unwarranted invasion of the constitutional rights of the people.

We will also find unconstitutional an apportionment plan with effects so severe as to threaten our democratic form of government. *See Stiglitz*, 40 S.W.2d at 321 (finding apportionment plan unconstitutional where its constitutional failings "reache[d] the very vitals of democracy itself"). Unquestionably, a profound and central tenet of our Kentucky Constitution is an unyielding commitment to democracy. Indeed, the Preamble of our Constitution declares its purpose as the recognition and establishment of "the great and essential principles of liberty and free government." Section 4 places meat on the bones of this pronouncement:

> All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness and the protection of property. For the advancement of these ends, they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may deem proper.

Ky. Const. § 4. Thus, in sum, we will find an apportionment plan unconstitutional where it involves either a clear, flagrant, and unwarranted

21

invasion of the constitutional rights of the people, or effects so severe as to threaten our Commonwealth's democratic form of government.

### C. Justiciability of Claims of Unconstitutionally Partisan Gerrymandering

These same standards apply when the plaintiff's challenge is that an apportionment plan violates the Constitution because it results from partisan gerrymandering. As noted above, legislative apportionment is an inherently political process assigned to the General Assembly. An expectation that apportionment will be free of partisan considerations would thus not only be unrealistic, but also inconsistent with our Constitution's assignment of responsibility for that process to an elected political body. *See City of Lebanon*, 436 S.W.3d at 519 (noting that governance often involves the making of political choices); *see also Rucho*, 139 S. Ct. at 2497 ("To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities.").

It is thus unsurprising that our prior cases have suggested, if not held, that mere partisanship alone will not render an apportionment plan unconstitutional. In *Jensen*, for example, we stated that "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." 959 S.W.2d at 776. We also noted in *Stiglitz* that "[t]he Constitution is not concerned with election returns, but contemplates equal representation based upon population and territory." 40

22

S.W.2d at 321. Moreover, Section 33 lacks any express prohibition on partisan considerations during the apportionment process, despite the fact the Delegates referenced the practice of partisan gerrymandering during the Debates. *See* Constitutional Debates, Vol. 3, p. 3984 (discussing "Republican gerrymandering" in the State of New York); *id.*, Vol. 4, p. 4620 (referring to previous Kentucky legislature's political gerrymandering). This silence further suggests the Delegates did not intend to go so far as to prohibit any consideration of partisan interests in the apportionment process. As such, we make plain what we have previously suggested and hold that the Kentucky Constitution does not wholly forbid the General Assembly's consideration of any partisan interest whatsoever in the apportionment process.

That said, there are of course limits. While the Kentucky Constitution does not categorically forbid *any* consideration of partisan interests in the apportionment process, partisanship may of course rise to an unconstitutional level. As with other constitutional challenges to apportionment plans, a claim that an apportionment plan is unconstitutionally partisan may be considered by the judiciary without violating the political question doctrine. We consider such claims under the same substantially deferential standards applicable to other constitutional challenges to apportionment plans. That is, we ask not whether the partisanship constitutes some slight or technical deviation from constitutional limitations, but rather whether it either involves a clear, flagrant, and unwarranted invasion of the constitutional rights of the people, or is so

23

severe as to threaten our Commonwealth's democratic form of government. *See supra* pp. 16-21.

Finally, we pause to note that the substantially deferential standard we apply to claims of unconstitutional partisanship in apportionment plans—and indeed to any constitutional challenge to an apportionment plan—is not a judicial abdication of responsibility to uphold the Constitution. Rather, it reflects an appropriate balancing of the significant considerations and tensions inherent in a judicial review of the purely legislative and political apportionment process. As recently stated by the United States Supreme Court,

> An expansive standard requiring "the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process." . . . The expansion of judicial authority would not be into just any area of controversy, but into one of the most intensely partisan aspects of American political life. That intervention would be unlimited in scope and duration—it would recur over and over again around the country with each new round of districting, for state as well as federal representatives.

*Rucho,* 139 S. Ct. at 2498, 2507. Today we heed these sage words and apply our deferential standard not in an abdication of judicial responsibility, but rather in the interest of good governance that flows from the separation of powers and an avoidance of an unnecessary entanglement of the judiciary in the overwhelmingly and inherently political process of legislative apportionment. Let no one mistake our deference, however, as any hesitancy whatsoever to vigilantly guard the constitutional rights of the people and our democratic form of government should duty call.

### III. The Apportionment Plans Are Not Unconstitutionally Partisan.

In applying these standards to our consideration of Appellants' claims, we conclude the Apportionment Plans do not involve an unconstitutional level of partisan gerrymandering. Under HB 2, Republicans won 80 of the 100 State House seats in the 2022 elections. Under HB 191, the alternative apportionment plan relied upon by Appellants, Republicans were projected to win at least seventy-seven of those seats. Admittedly, Appellants' expert testified that his assessment of relevant partisanship metrics showed that HB 2 had a greater pro-Republican bias than he had ever seen. We note that every seat is important. Even so, we simply cannot find that a disparity between HB 2 and HB 191 of 3 out of 100 seats involves partisanship either rising to the level of a clear, flagrant, and unwarranted violation of constitutional rights or so severe as threaten our democratic form of government. As noted above, the mere presence of some partisanship does not, without more, render an apportionment plan unconstitutional. While partisan redistricting resulting in a more significantly disparate outcome might rise to a level of constitutional infirmity, we need not resolve today precisely what level of disparate result would warrant such a finding. Suffice it to say for now that HB 2 does not meet the standard.

Nor do we find SB 3's Congressional redistricting to be unconstitutionally partisan. SB 3 resulted in a 5-1 split of Kentucky's Congressional districts between Republicans and Democrats, respectively, in the 2022 elections. Notably, the evidence at trial showed that a 4-2 split of the districts was

impossible, and that even 14.3% of the 10,000 sample maps prepared by Appellants' expert resulted in Republicans winning all six districts with Democrats taking none. Again, on such facts we cannot find any alleged partisanship in the crafting of SB 3 either a flagrant or unwarranted invasion of constitutional rights or so severe as to threaten our democratic form of government.

## IV. The Apportionment Plans Do Not Violate The Free And Equal Elections Provision of the Kentucky Constitution.

Turning from partisanship more generally, we now consider the constitutionality of the Apportionment Plans under the specific provisions of the Kentucky Constitution relied upon by Appellants. First, we agree with the trial court's conclusion that the alleged partisanship in the Apportionment Plans does not violate Section 6 of the Kentucky Constitution.

Section 6 provides that "[a]ll elections shall be free and equal." Ky. Const. § 6. It is the role of the judiciary to determine whether legislative enactments infringe upon this constitutional guarantee. *See, e.g., Asher v. Arnett*, 280 Ky. 347, 132 S.W.2d 772 (1939); *see also Leeman v. Hinton*, 62 Ky. 37, 40 (1863) ("[T]he authority to decide as to the freedom and equality of elections . . . forms a part of the general jurisdiction of the circuit courts."). We have thus previously explained the meaning of "free" and "equal" for purposes of Section 6:

> "To be free means that the voter must be left in the untrammeled exercise, whether by civil or military authority of his right or privilege—that is, no impediment or restraint of any character shall be imposed upon him either directly or indirectly whereby he shall be hindered or prevented from participation at the polls. The word

26

'equal' comprehends the principle that every elector has the right to have his vote counted for all it is worth in proportion to the whole number of qualified electors desiring to exercise their privilege. The guaranty, therefore, means that every qualified voter may freely exercise the right to cast his vote without restraint or coercion of any kind and that his vote, when cast, shall have the same influence as that of any other voter. As otherwise expressed, an election is free and equal within the meaning of the Constitution when it is public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him."

*Asher*, 132 S.W.2d at 776 (citation omitted).

Section 6's guarantee of *free* elections is thus violated when restraint or coercion, physical or otherwise, is exercised against a voter's ability to cast a vote. *Id.*; *see also Burns v. Lackey*, 171 Ky. 21, 186 S.W. 909, 915 (1916). Section 6's guarantee of *equal* elections is violated when a voter's vote is not afforded "the same influence as that of any other voter." *Asher*, 132 S.W.2d at 776.

Appellants urge us to find that partisanship in the crafting of the Apportionment Plans violates Section 6's guarantee of free and equal elections. However, we long ago held that mere partisanship in the regulation of elections does not violate Section 6. In *Purnell v. Mann*, 105 Ky. 87, 48 S.W. 407, 408 (1898), appellants challenged a statute providing that the General Assembly was to elect a State Board of Election Commissioners, which then could appoint a County Board of Election Commissioners, which in turn would appoint election officers at the county level. The appointment of such a slate

27

for a county replaced the old law's provision for a board and election officers drawn from or appointed by the county court, which at that time had judges elected by reference to party affiliation.[4] *Id.* The Court considered and rejected the contention that the General Assembly's election of a State Board composed wholly of members of one party would violate the free and equal elections provision:

> [T]he truth is, neither the old nor the new law could or does fully accomplish the object of wholly devesting the appointment of election officers from party bias or influence, and it would be difficult to frame a law that would do so. It would, therefore, be futile for this court, even if the subject was within its proper sphere, to pronounce a statute void because defective in that respect, when the law thereby revised is little, if any, less so.

*Id.* at 409-10. In other words, though the General Assembly might appoint a wholly partisan State Board of Election Commissioners, that alone did not violate Section 6.

Similarly, we cannot find the Apportionment Plans violative of Section 6's guarantee of free and equal elections simply because there may have been some partisanship in their crafting. As with the General Assembly's appointment of election commissioners in *Purnell*, it would be nearly impossible for the elected political body of the General Assembly to entirely ignore partisan considerations in the apportionment process. And it would be futile of us to impose any such requirement. As such, we cannot conclude the mere presence of some partisanship in the apportionment process violates Section 6's guarantee of free and equal elections.

---

[4] Judicial elections in Kentucky are now non-partisan. Ky. Const. § 117.

The Apportionment Plans do not restrain or coerce the casting of any votes and thus do not infringe on the guarantee of free elections. Moreover, each vote under the Appropriation Plans counts as one vote. Admittedly, the districting process inevitably combines voters such that the voters of one party or another will be more or less likely to have their candidates win. Significantly, however, the right to *vote* is not the same as the right to have one's chosen candidate *win*. Nowhere does our Constitution guarantee such a right, nor logically could it. By definition, elections have winners and losers. What matters for purposes of Section 6's promise of equal elections is not *whose* preferred candidate wins, but rather that each voter's vote receives the same weight as each and every other vote. The Apportionment Plans in no way infringe upon that right, and thus we cannot find them violative of Section 6's guarantee of free and equal elections.

Appellants point us to recent decisions by the Supreme Court of Pennsylvania interpreting that state's constitutional guarantee of free and equal elections to prohibit partisan gerrymandering. *See, e.g., League of Women Voters v. Commonwealth of Pennsylvania*, 178 A.3d 737, 817 (Pa. 2018) (holding that legislature's subordination of neutral redistricting criteria to "extraneous considerations such as gerrymandering for unfair partisan political advantage" violates Pennsylvania Constitution's guarantee of free and equal elections). Because our Kentucky Bill of Rights was taken almost verbatim from the 1790 Pennsylvania Constitution, decisions of the Supreme Court of Pennsylvania interpreting provisions of the Pennsylvania Constitution similar

29

to the Kentucky Bill of Rights are "very persuasive to the Courts of the Commonwealth and should be given as much deference as any non-binding authority receives." *Yeoman v. Commonwealth*, 983 S.W.2d 459, 473 (Ky. 1998); *Commonwealth v. Wasson*, 842 S.W.2d 487, 492 (Ky. 1992).

Nonetheless, we do not interpret our Constitution or case law to reach the Supreme Court of Pennsylvania's conclusion that mere consideration of partisan interests in the apportionment process violates the guarantee of free and equal elections. First, this Court has already held in *Purnell* that mere partisanship in the regulation of elections does not violate Section 6. 48 S.W. at 409-10. Second, Section 33 of the Kentucky Constitution sets forth a large number of specific criteria for the apportionment process yet includes no express prohibition on the consideration of partisan interests. The lack of such a prohibition when partisan gerrymandering was familiar to the Delegates suggests they did not intend to prohibit that practice in its entirety. Finally, it also bears noting that partisan gerrymandering is not always and necessarily so existential a threat to our democracy as to violate the guarantee of free and equal elections. After all, from 2012 to 2020 the Republicans gained control of the House of Representatives under a redistricting map enacted by a previous Democratic majority. As such, we do not find the alleged partisanship in HB 2 or SB 3 violative of Section 6's guarantee of free and equal elections.

## V. The Apportionment Plans Do Not Violate Equal Protection Guarantees.

We also agree with the trial court's conclusion that the Apportionment Plans do not violate equal protection principles. The equal protection

30

provisions of the Kentucky Constitution are set forth in Sections 1, 2, and 3. *Zuckerman v. Bevin*, 565 S.W.3d 580, 594 (Ky. 2018). These sections provide in relevant part that "[a]ll men are, by nature, free and equal," Ky. Const. § 1, that "[a]bsolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority," Ky. Const. § 2, and that "[a]ll men, when they form a social compact, are equal; and no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men," Ky Const. § 3.

In reviewing claims that a statute violates equal protection, we apply one of three levels of scrutiny depending on the nature of the statute. When the statute either makes a classification based upon a suspect class, such as race, alienage, or ancestry, or affects a fundamental right, we apply strict scrutiny. *Zuckerman*, 565 S.W.3d at 595. That is, we ask whether the statute is "suitably tailored to serve a compelling state interest." *Id.* (citations omitted). When the statute makes a classification based upon a quasi-suspect class, such as gender or illegitimacy, we apply intermediate scrutiny and thus ask whether the statute is "'substantially related to a legitimate state interest.'" *Id.* (quoting *Varney*, 36 S.W.3d at 394). Finally, for all other statutes we simply ask whether "a 'rational basis' supports the classifications that it creates." *Id.* at 596 (quoting *Elk Horn Coal Corp. v. Cheyenne Res., Inc.*, 163 S.W.3d 408, 418-19 (Ky. 2005)).

Appellants contend that HB 2 violates equal protection principles, pointing to expert proof that the result of a 50/50 split of the vote between

31

Republicans and Democrats in a Kentucky House election under HB 2 would result in Republicans winning 60 of the 100 House seats. Appellants thus assert HB 2 interferes with the fundamental right to vote and warrants strict scrutiny. We disagree.

Statutes that substantially affect the exercise of a fundamental right, including the right to vote, are subject to strict scrutiny when challenged on equal protection grounds. *Mobley v. Armstrong*, 978 S.W.2d 307, 309 (Ky. 1998). The gravamen of Appellants' claim however is not that HB 2 substantially affects their ability to vote, but rather that HB 2 makes it harder for Democrats than other groups of voters to elect a governing majority. As noted above, the right to *vote* is not the same as the right to *win*. The Apportionment Plans in no way make it harder for Democrats to vote, nor do they otherwise interfere with the fundamental right to vote. As such, HB 2 warrants only rational basis review.

To survive rational basis review, the classifications drawn by a statute need only "rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed." *Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 469 (Ky. 2011) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 190 (1964)). Here, Appellants' equal protection argument rests upon proof that a 50/50 vote split in a House election under HB 2 would result in Republicans winning 60 of the 100 House seats. Such disparity might be constitutionally significant if the expectation of a 50/50 vote split comported with the realities of Kentucky's political geography, but it does

32

not. Kentuckians simply do not split their votes in near equal measure between the two dominant political parties. Moreover, our legislative elections are conducted by district, not at-large. And as aptly noted by the trial court, Appellants' argument also ignores the interests of voters not affiliated with any particular party as well as those party-affiliated voters who may also vote for candidates from other parties.

A more accurate comparison is between HB 2, which resulted in Republicans winning 80 seats in the 2022 elections, and Democrats' proposed HB 191 which, when considering Kentucky's current political geography, would be expected to result in Republicans winning 77 seats. We acknowledge that 3 out of 100 House seats is not wholly insignificant, but we also simply cannot find that difference in outcomes so significant as to indicate the absence of "a reasonable and just relation" between HB 2 and its purpose of dividing the Commonwealth into 100 State House districts while considering population equality and county integrity. As such, HB 2 satisfies rational basis review.

Similarly, SB 3 also satisfies rational basis review. Again, as noted above the evidence at trial showed that while the General Assembly could have devised a map that would likely result in no Democratic Congressional seats, and could not possibly have created a map with two likely Democratic Congressional districts, SB 3 as enacted allows for the one Democratic seat possible given Kentucky's political geography.[5] Moreover, the evidence at trial

---

[5] In 2012, a number of press stories reported that Central Kentucky's congressional district had been redistricted to help its Democratic incumbent retain the seat. E.g., Jack Brammer and Linda Blackford, Barr Wins Easily, Setting Up

33

demonstrated that SB 3 does so while complying with the one-person one-vote principle required for such districts. Thus, like HB 2, SB 3 bears a reasonable and just relation to its purpose of Congressional redistricting. As such, we also agree with the trial court's conclusion that SB 3 does not violate the equal protection principles set forth in Sections 1, 2, and 3 of the Kentucky Constitution.

**VI.    The Apportionment Plans Do Not Infringe On The Freedom of Speech and Assembly.**

Appellants also argue that the Apportionment Plans violate the rights to freedom of speech and assembly. Section 1 of the Constitution guarantees these rights to the people, framed as "[t]he right of freely communicating their thoughts and opinions" and "[t]he right of assembling together in a peaceable manner for their common good."

We find no violation of these rights in the Apportionment Plans. Quite simply, the Plans do not in any way limit the ability of the people to freely communicate their thoughts and opinions or otherwise speak, nor to assemble or associate for political purposes. The people remain entirely free to engage in such activities regardless of where the General Assembly has set the district boundaries. *See Rucho*, 139 S.Ct. at 2504 ("[T]here are no restrictions on speech, association, or any other First Amendment activities in the districting

Rematch with Chandler, LEXINGTON HERALD-LEADER, May 23, 2012, at A1, A6; Editorial, Redistricting Plan Needs to Be Done Fairly, PARK CITY [KY.] DAILY NEWS, Jan. 15, 2012, at C2; Roger Alford, Lawmakers Approve Districts for Congress, MESSENGER-INQUIRER [Owensboro, Ky.], Feb. 11, 2012, at A1. That incumbent lost the 2012 election, and Kentucky's congressional delegation has remained 5 Republicans, 1 Democrat since.

plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district."). As such, we find no violation of the freedom of speech or assembly in the Apportionment Plans.[6]

## VII. SB 3 Is Not Unconstitutionally Arbitrary.

We further agree with the trial court's conclusion that SB 3 does not violate Section 2 of the Kentucky Constitution.[7] Section 2 unquestionably prohibits unjustly arbitrary government action:

> Section 2 is a curb on the legislature as well as on any other public body or public officer in the assertion or attempted exercise of political power. Whatever is contrary to democratic ideals, customs and maxims is arbitrary. Likewise, whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary. No board or officer vested with governmental authority may exercise it arbitrarily. If the action taken rests upon reasons so unsubstantial or the consequences are so unjust as to work a hardship, judicial power may be interposed to protect the rights of persons adversely affected.

*Kentucky Milk Mktg. & Antimonopoly Comm'n v. Kroger Co.*, 691 S.W.2d 893, 899 (Ky. 1985) (citations omitted).

We find no such contradiction of democratic ideals, injustice, or inequality in SB 3. Again, that Plan resulted in the election of one Democratic Congressional Representative, the most possible under Kentucky's current political geography, when alternate plans could have resulted in no such Representative. We cannot deem that result undemocratic, unjust, or unequal.

---

[6] Appellants also contend the Apportionment Plans are unconstitutional retaliation for exercising the right to vote for Democratic candidates, but point to no evidence of record in support of that argument.

[7] Appellants argued before the trial court that both HB 2 and SB 3 were unconstitutionally arbitrary. Before us Appellants urge only that SB 3 is arbitrary, and thus we do not consider whether HB 2 violates Section 2.

Though Appellants point to testimony by the Commonwealth's expert Sean Trende surmising that the Second Congressional District was the result of an effort to preserve that district for deceased Congressman William Natcher, the trial court noted that Trende's testimony was not based on personal knowledge. Moreover, at oral argument the Commonwealth's counsel explained that the boundaries of the district were maintained in furtherance of a general effort to preserve the historical boundaries of the districts to the extent possible, a reasonable consideration in the Congressional redistricting process. We thus also do not find the reasoning underlying the General Assembly's Congressional redistricting so lacking in substance as to be unconstitutionally arbitrary. We thus agree with the trial court's conclusion that the Apportionment Plans do not violate Section 2.

### VIII. HB 2 Satisfies Section 33's Dual Mandate of Population Equality and County Integrity.

Finally, we also agree with the trial court that HB 2 does not violate Section 33 of the Kentucky Constitution. Section 33 requires the General Assembly to reapportion the State Senate and House districts every ten years in accordance with the following requirements:

> [The General Assembly] shall divide the State into thirty-eight Senatorial Districts, and one hundred Representative Districts, as nearly equal in population as may be without dividing any county, except where a county may include more than one district, which districts shall constitute the Senatorial and Representative Districts for ten years. Not more than two counties shall be joined together to form a Representative District: Provided, In doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated. . . . If, in making said districts, inequality of population should be unavoidable, any advantage resulting therefrom shall be given to districts having the

36

largest territory. No part of a county shall be added to another county to make a district, and the counties forming a district shall be contiguous.

Ky. Const. § 33.

Taken literally, Section 33 sets forth a number of criteria and limitations for the redistricting process. There must be 38 Senate districts and 100 House districts. The districts must be as nearly equal in population as possible without dividing any county unless that county is capable of containing more than one district. The General Assembly may not join more than two counties together to form a House district. Nor may it add one part of a county to another county to make a district. All counties forming a district must be contiguous. Finally, these criteria and limitations must be applied with consideration for the fundamental and primary directive to achieve population equality across districts, and to afford advantage of unavoidable population inequality to districts having the largest territory.

When taken together, these criteria and limitations provide the General Assembly with dual directives to achieve population equality and maintain county integrity in the drawing of the legislative districts. *Fischer IV*, 366 S.W.3d at 911. Almost immediately after the 1891 adoption of our present Constitution, Kentucky courts began grappling with the inherent tension between these two competing commands. For example, this Court's predecessor held in 1907 that while Section 33 literally prohibits the joining of more than two counties to form a House district, "more than two counties may be joined in one district, provided it be necessary to effectuate that equality of

37

representation which the spirit of the whole section so imperatively demands." *Ragland*, 100 S.W. at 870. Later, application of the one-person one-vote principle required by federal constitutional equal protection principles further complicated the General Assembly's ability to fully comply with the literal directives of Section 33. *See Fischer IV*, 366 S.W.3d at 912.

We have since endeavored in our decisions to articulate how the General Assembly may accommodate Section 33's competing requirements of population equality and county integrity, along with the one-person one-vote principle, where full compliance with all of Section 33's criteria is not possible. We have recognized that population equality and county integrity are competing, yet equally important, considerations under Section 33. *Fischer II*, 879 S.W.2d at 477 ("[A]s between the competing concepts of population equality and county integrity, the latter is of at least equal importance."). In *Fischer II*, we therefore held that the General Assembly may satisfy Section 33's dual directives of population equality and county integrity by 1) achieving a population distribution between districts that "does not exceed -5% to +5% from an ideal legislative district" and 2) dividing "the fewest possible number of counties." *Id.* at 479. We most recently reaffirmed this dual mandate in *Fischer IV*, where we again held that

> Section 33 imposes a dual mandate that Kentucky's state legislative districts be substantially equal in population and preserve county integrity. A reapportionment plan satisfies these two requirements by (1) maintaining a population variation that does not exceed the ideal legislative district by -5 percent to +5 percent and (2) dividing the fewest number of counties possible.

366 S.W.3d at 911.

38

Here, the trial court found—and the parties agree—that HB 2 achieves population equality within the 5% variation limit set forth in *Fischer II*. The parties also stipulated at trial that HB 2 divides the fewest number of counties possible. There is thus no question that HB 2 complies with *Fischer II's* dual mandate for satisfaction of Section 33's population equality and county integrity directives. Appellants nonetheless urge us to hold that to comply with Section 33, an apportionment plan must not only comply with *Fischer II's* dual mandate, but also include no deviations from each of Section 33's literal and technical redistricting criteria not strictly necessary to achieve population equality.

We first note that Section 33 is a constitutional command and thus where compliance with all of its criteria is possible, the General Assembly is not free to deviate from those criteria. *Fischer II's* dual mandate has no applicability in such circumstances, which instead require the General Assembly to maintain a steadfast adherence to the plain language of Section 33 in the apportioning of legislative districts.

However, we have also acknowledged it may not always be possible for an apportionment plan to comply with each and every one of Section 33's criteria. *Compare* Ky. Const. § 33 ("No part of a county shall be added to another county to make a district . . . .") *and Jensen*, 959 S.W.2d at 775 ("What is clear from the debates and from the language of Section 33 is that the delegates did not intend that any territory of one county be added to another county to make a district. . . . Yet, because of the overriding principle of equality of population,

39

we recognized in *Fischer II* that this mandate cannot be achieved."). Indeed, Section 33 itself indicates that its criteria are not inexorable, binding commands, but rather considerations that must be reasonably and fairly balanced in the crafting of districts. For example, in the same breath that Section 33 commands "[n]ot more than two counties shall be joined together to form a Representative District," it offers the qualification that "[i]n doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated." In other words, while Section 33 prohibits the joining of more than two counties, it also states this prohibition should not be applied so as to result in population inequality between the districts. Similarly, Section 33 both commands population equality and recognizes that the advantage flowing from any necessary population *inequality* must be afforded to districts with the largest territory: "[T]he principle requiring every district to be as nearly equal in population as may be shall not be violated . . . If, in making said districts, inequality of population should be unavoidable, any advantage resulting therefrom shall be given to districts having the largest territory."

The dual mandate of *Fischer II* endeavors to provide guidelines for the General Assembly in the crafting of legislative districts when literal and full compliance with all of the criteria set forth in Section 33 is not possible. Today, in recognition of the realities of the modern apportionment process, the already difficult task faced by the General Assembly in redistricting, and the likely impossibility of full literal compliance with each and every one of Section 33's criteria, we reaffirm that an apportionment plan's compliance with the

40

dual mandate set forth in *Fischer II* generally will likewise suffice for compliance with Section 33 if literal and complete compliance with each of Section 33's criteria is impossible.

We further hold that where such impossibility arises, the General Assembly may include even unnecessary deviations from the particular criteria of Section 33, provided it otherwise fully complies with the dual mandate of *Fischer II* and the deviations are not so numerous or unnecessary as to constitute a clear and flagrant disregard of Section 33's fundamental directives of population equality and county integrity. In other words, compliance with *Fischer II's* dual mandate alone is not a constitutional safe harbor; an apportionment plan may satisfy the dual mandate of *Fischer II* as a whole but in its particulars so clearly and flagrantly disregard Section 33's overarching directives of population equality or county integrity as to violate the very spirit of Section 33 and thus be unconstitutional. Aside from such exceptions, however, compliance with *Fischer II's* dual mandate likewise constitutes compliance with Section 33 where literal and full compliance with each of Section 33's criteria is not possible.

Appellants acknowledge our case law recognizing that Section 33's criteria cannot all be observed in every instance. They also acknowledge that the proposed maps in HB 191 do not comply with all of Section 33's criteria given the impossibility of full compliance. Appellants argue however that HB 2 violates Section 33 because HB 2 subjects certain counties to more splits than necessary to achieve population equality. We have previously rejected

41

arguments that a single county may not be divided multiple times. *Jensen,* 959 S.W.2d at 776 (holding that subjecting a "county or remnant thereof" to multiple divisions is not constitutionally prohibited, including because "[n]o one now suggests that any redistricting plan could be drafted without some such multiple divisions."). Today, we extend that decision and hold that where full compliance with Section 33 is impossible, an apportionment plan's inclusion of more multiple splits of a single county than strictly necessary to achieve population equality does not, without more, violate Section 33.[8]

In thus holding, we of course remain mindful of the importance of maintaining county integrity in the apportionment process. *Jensen,* 959 S.W.2d at 774-75 ("[A]fter satisfying the requirement of approximate equality of population, the next priority of a reapportionment plan is the preservation of county integrity . . . ."). We likewise remain mindful of the central significance of the county in both the political geography of the Commonwealth and in the daily lives of Kentuckians. *See Fischer II,* 879 S.W.2d at 478 ("In substance and in form, the county unit is at the heart of economic, social and political life in Kentucky."). We can of course conceive of apportionment plans that so

---

[8] Appellants again point us to Pennsylvania, whose Supreme Court has held that an apportionment plan's inclusion of "political subdivision splits that were not absolutely necessary" violated the Pennsylvania Constitution. *Holt v. 2011 Legis. Reapportionment Comm'n,* 38 A.3d 711, 757 (Pa. 2012). Notably, however, the Pennsylvania Constitution explicitly directs that no political subdivision be divided in the apportionment process unless "absolutely necessary." Pa. Const., art. II, § 16 ("[U]nless *absolutely necessary* no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.") (emphasis added). Section 33 of the Kentucky Constitution does not contain similar language, and we thus decline to follow *Holt's* holding that only absolutely necessary county divisions pass constitutional muster.

excessively subject counties to multiple splits as to clearly and flagrantly disregard Section 33's mandate for consideration of county integrity and thus violate that provision. This however is not such a case. HB 2 splits twenty-three counties a total of eighty times, while HB 191 relied upon by Appellants would have split those twenty-three counties sixty times. We thus do not perceive in HB 2 such a clear and flagrant disregard of Section 33's county integrity mandate as to warrant a finding of constitutional infirmity.

Appellants also argue HB 2 violates Section 33 because it unnecessarily adds portions of one county to another county. On this point, we have previously recognized that

> [w]hat is clear from the [1890 Constitutional Debates] and from the language of Section 33 is that the delegates did not intend that any territory of one county be added to another county to make a district. . . . Yet, because of the overriding principle of equality of population, we recognized in *Fischer II* that this mandate cannot be achieved.

*Jensen*, 959 S.W.2d at 775. We further hold today that where full compliance with Section 33 is not possible, an apportionment plan's mere addition of portions of one county to another in the forming of districts, even when not strictly necessary, does not, without more, violate Section 33. Again, this holding is not a safe harbor. The inclusion of such deviations may of course so clearly and flagrantly disregard the commands of population and county integrity as to violate Section 33. And again, this is not such a case. HB 2 created forty-five districts that were composed of one county and a portion of another, while HB 191 created thirty-one such districts. This disparity simply does not rise to the level of a clear and flagrant disregard of the dual mandates

43

of Section 33, and we thus do not find that it renders the Apportionment Plans constitutionally infirm.

Appellants' final argument is that HB 2 violates Section 33 by including more than two counties in a district even when not strictly necessary. We have previously held that an apportionment plan may include districts composed of more than two counties when necessary. *Ragland*, 100 S.W. at 870 ("[M]ore than two counties may be joined in one district, provided it be necessary in order to effectuate that equality of representation which the spirt of the whole section so imperatively demands."); *Combs v. Matthews*, 364 S.W.2d 647, 649 (Ky. 1963) ("[T]he General Assembly may enact a redistricting plan . . . includ[ing] more than two (2) counties in a representative district if it deems that it is necessary in order to effect a reasonable equality of representation among respective districts.") Today, again in recognition of the realities, difficulties, and impossibilities that inhere in the redistricting process, we extend these decisions. We hold that where full compliance with Section 33 is not possible, an apportionment plan does not violate Section 33 by combining more than two counties into a district, even when not strictly necessary, provided the plan does not include such combinations in a number or of such a nature as to clearly and flagrantly disregard the fundamental dual mandates of population equality and county integrity enshrined in Section 33.

HB 2 includes no such disregard. HB 2 includes thirty-one districts including more than two counties, while HB 191 included twenty-three such districts and Appellants' expert's simulated alternative maps included on

44

average twenty-four such districts. We cannot conclude this level of disparity is indicative of a clear and flagrant disregard by the General Assembly of the county integrity mandate, and thus find HB 2 compliant with the dual mandates of population equality and county integrity enshrined in Section 33. The Apportionment Plans thus pass constitutional muster.

Finally, because we find the Apportionment Plans constitutional, and because Appellees challenged the 2012 redistricting plans only to the extent they might be offered as an alternative in the event we held the current Apportionment Plans unconstitutional, we also agree with the trial court's conclusion that Appellees' challenge to the 2012 redistricting plans is moot.

**CONCLUSION**

In sum, we hold that Appellants have standing to bring their claims. We further hold that Appellants' challenges to the Apportionment Plans are justiciable, including their claim that the Plans involve unconstitutionally partisan gerrymanders.

In considering constitutional challenges to the General Assembly's apportionment plans, including claims of unconstitutional partisanship, we apply a substantially deferential standard given the political nature of the apportionment process. We will find such a plan unconstitutional if it involves a clear, flagrant, and unwarranted deviation from constitutional limitations, or if its effects are so severe as to threaten our democratic form of government.

The alleged partisanship in the crafting of the Apportionment Plans does not rise to the level of a clear, flagrant, or unwarranted deviation from

45

constitutional limitations or a threat to our democratic form of government. Nor do we perceive in the Apportionment Plans any violation of the constitutional guarantees of free and fair elections, equal protection, freedom of speech and assembly, or freedom from arbitrary government action.

We further reaffirm that where full compliance with Section 33 is not possible in the crafting of state legislative districts, the General Assembly must satisfy the dual mandates of population equality and county integrity set forth in *Fischer II* in order to comply with Section 33. Under such circumstances, the General Assembly may deviate from literal criteria and limitations of Section 33, even when not strictly necessary, provided it does not do so in a manner that either clearly and flagrantly disregards the fundamental purpose of Section 33 in promoting population equality and county integrity in the apportionment process, or threatens the democratic form of government. The particulars of HB 2 reveal no such disregard or threat and we thus find that it complies with Section 33. Accordingly, the judgment of the trial court is affirmed.

All sitting. This Opinion constitutes the majority Opinion of the Court on all issues addressed. Chief Justice VanMeter and Justices Bisig, Nickell, Thompson, and Keller concur in Part I. Justices Conley and Lambert dissent from Part I. Chief Justice VanMeter and Justices Bisig, Keller, and Thompson concur in Parts II and III. Justices Conley, Lambert, and Nickell dissent from Parts II and III. Chief Justice VanMeter and Justices Bisig, Keller, Nickell, and Thompson concur in Part IV. Justices Conley and Lambert dissent from Part

IV. Chief Justice VanMeter and Justices Bisig, Keller, and Thompson concur in Parts V, VI, and VII. Justices Conley, Lambert, and Nickell dissent from Parts V, VI, and VII. Chief Justice VanMeter and Justices Bisig, Nickell, and Thompson concur in Part VIII. Justice Conley, Lambert, and Keller dissent from Part VIII.

**NICKELL, J., CONCURRING IN PART, DISSENTING IN PART:** I concur with the majority's resolution of Plaintiffs' claims on the merits under Sections 6 and 33 of the Kentucky Constitution. I respectfully dissent in part and write separately because the remaining claims should have been dismissed as non-justiciable political questions. In my view, the majority fails to sufficiently articulate neutral and judicially manageable standards to measure claims of partisan gerrymandering when our Constitution and statutory law are silent on the issue.

While "judicial review can provide a meaningful check on the worst abuses in the redistricting process, . . . the efficacy of that check depends critically upon the legal tools, both procedural and substantive, given the courts." Norman R. Williams, *Partisan Gerrymandering: The Promise and Limits of State Court Judicial Review*, 106 Marq. L. Rev. 949, 1014 (2023). To "polic[e] the redistricting process, especially with regard to partisan gerrymandering, . . . courts [must] be armed with something more useful than vague prohibitions" against the violation of unspecified constitutional rights and speculative injuries to our democratic form of government. *Id.*

47

Without clear and manageable standards to draw the line on excessive partisan gerrymandering, the balancing of judicial review with an extension of substantial deference to the legislature amounts to nothing "more than considering [a claimant's] views with attentiveness and profound respect, before we reject them." *See* Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 514 (1989). To equate such an illusory process with meaningful constitutional review distorts the operation of our core judicial function. *See United States v. Robel*, 389 U.S. 258, 268 n.20 (1967) (noting it is inappropriate to balance a party's constitutional rights against governmental interests). Faced with the silence of the Kentucky Constitution and statutory law on the issue of partisan gerrymandering, I would declare "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion). Chief Justice Marshall anticipated the development of this limitation on judicial power, noting:

> [t]he province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.

*Marbury v. Madison*, 5 U.S. 137, 170 (1803). His conclusion is equally applicable in relation to judicial review of purely textual legislative functions.

Thus, any comprehensive remedy for the deleterious effects of partisan gerrymandering must be addressed through the political process. Should the people discern egregious, arrogant political abuse upon review of the legislative redistricting plans enacted by their elected representatives in the General Assembly, their ultimate remedy lies in a constitutional amendment or expulsion of the perpetrators at the polls. In short, review and remedy of controversies related to political gerrymandering reside with the people.

The justiciability of partisan gerrymandering claims cannot be evaluated as a single, abstract unit. Each of the Plaintiffs' claims must be analyzed separately to determine whether it is justiciable under the political question doctrine. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006). The assertion of a justiciable claim does not entitle a litigant to judicial review of other non-justiciable claims even "if they 'derived from' the same 'operative fact[s][.]'" *Id.* Otherwise, a "court would be free to entertain moot or unripe claims, or claims presenting a political question[.]" *Id.* Courts routinely determine some interrelated claims justiciable, while others not. *See Ariz. Publ. Serv. Co. v. EPA*, 211 F.3d 1280, 1284 (D.C. Cir. 2000). In my view, Plaintiffs' challenges to the redistricting maps under Sections 6 and 33 of the Kentucky Constitution are justiciable while their claims that partisan gerrymandering infringed their rights to free speech, free assembly, equal protection, and freedom from arbitrary action should have been dismissed as non-justiciable political questions.

Section 112(2)(b) of the Kentucky Constitution endows the circuit courts with "original jurisdiction of all justiciable causes not vested in some other court." In *Cabinet for Health & Fam. Servs. v. Sexton*, 566 S.W.3d 185, 195 (Ky. 2018), we interpreted this requirement to align with the "case or controversy" language contained in Article III, Section 2, Clause 1 of the U.S. Constitution, which is "is the lynchpin for all justiciability doctrines[.]" *Id.* "By limiting the circuit court's jurisdiction to adjudicating justiciable causes only, § 112(5) appears to have adopted some notion of the justiciability doctrines articulated by the U.S. Supreme Court." *Id.* Thus, we formally adopted federal constitutional standing doctrine. *Id.* at 196. Standing is one of the "five major justiciability doctrines," which also include, as pertinent here, the political question doctrine. *Id.* at 193.

Kentucky precedent on the justiciability of political gerrymandering claims originated prior to our current interpretation of Section 112(2)(b) as espoused in *Sexton. See Legis. Rsch. Comm'n v. Fischer*, 366 S.W.3d 905, 911 (Ky. 2012); *Jensen v. State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997); *Fischer v. State Bd. of Elections*, 879 S.W.2d 475, 476 (Ky. 1994); *Combs v. Matthews*, 364 S.W.2d 647, 648 (Ky. 1963); *Watts v. Carter*, 355 S.W.2d 657, 658 (Ky. 1962); *Watts v. O'Connell*, 247 S.W.2d 531, 532 (Ky. 1952); *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315, 317-18 (1931); and *Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865, 866-67 (1907). Moreover, the scope of judicial review in these decisions is fundamentally limited to compliance with

50

the requirements of Sections 6 and 33 of the Kentucky Constitution.[9]  Given

this backdrop coupled with the lack of coherent, judicially manageable

standards for the resolution of partisan gerrymandering claims beyond the

explicit mandates of Sections 6 and 33, I view the Supreme Court's recent

decision in *Rucho v. Common Cause*, 139 S.Ct. 2484 (2019), as highly

persuasive and would adopt its analysis on the political question doctrine.

In *Rucho,* the Supreme Court explained that when a "question is

entrusted to one of the political branches or involves no judicially enforceable

rights[,]" "the claim is said to present a 'political question' and to be

nonjusticiable—outside the courts' competence and therefore beyond the

courts' jurisdiction." *Id.* at 2494 (citations omitted).  Political questions lie

outside the courts' jurisdiction primarily because such claims lack 'judicially

discoverable and manageable standards for resolving [them].'" *Id.* (citation

omitted).  The Supreme Court recognized

---

[9] *See Fischer*, 366 S.W.3d at 911 ("Our holding that House Bill 1 is unconstitutional is based not upon federal law, but upon Section 33 of the Kentucky Constitution."); *Jensen,* 959 S.W.2d at 776 ("Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster . . . [t]his plan satisfies the constitutional requirements of Section 33[.]"); *Fischer*, 879 S.W.2d at 478 ("[Appellant] admits that the Act would pass muster under the Constitution of the United States and relies entirely on Section 33 of the Constitution of Kentucky."); *Combs*, 364 S.W.2d at 648 ("[I]t would be folly to construe Section 33 of our State Constitution in a manner that would delay the General Assembly in any way in attempting to meet its constitutional obligation of redistricting the State."); *Carter,* 355 S.W.2d at 658 ("[I]t is submitted that the act is arbitrary and in violation of § 6 of the Constitution[.]"); *O'Connell,* 247 S.W.2d at 532 ("Appellant bottoms his case on section 6 of our Constitution[.]"); *Stiglitz,* 40 S.W.2d at 320 ("It is apparent and indeed not denied that the apportionment violates section 33 of the Constitution."); *Ragland,* 100 S.W.at 867 ("That the act under discussion is grossly violative of section 33 of the Constitution, in that the injunction as to equality between the districts was not even pretended to be obeyed by the Legislature, is not and cannot be denied.").

[e]xcessive partisanship in districting leads to results that reasonably seem unjust. But the fact that such gerrymandering is "incompatible with democratic principles," does not mean that the solution lies with the federal judiciary. We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions. "[J]udicial action must be governed by *standard*, by *rule*," and must be "principled, rational, and based upon reasoned distinctions" found in the Constitution or laws. Judicial review of partisan gerrymandering does not meet those basic requirements.

*Id.* at 2506-07 (citations omitted). In pondering whether "excessive partisan gerrymandering" is remediable under state law, the Supreme Court cited specific

[p]rovisions in state statutes and state constitutions [that] can provide standards and guidance for state courts to apply. . . . Indeed, numerous other States are restricting partisan considerations in districting through legislation. One way they are doing so is by placing power to draw electoral districts in the hands of independent commissions. . . . Missouri is trying a different tack. Voters there overwhelmingly approved the creation of a new position—state demographer—to draw state legislative district lines.

Other States have mandated at least some of the traditional districting criteria for their mapmakers. Some have outright prohibited partisan favoritism in redistricting.

*Id.* at 2507-08 (citations omitted). "[H]owever, not every state has a legal framework empowering its state judiciary to assume and perform that role." Williams, 106 Marq. L.Rev. at 951. As the majority acknowledges, neither the Kentucky Constitution nor any statutory provision explicitly prohibits partisan gerrymandering.

With the foregoing authority in mind, each of the Plaintiffs' separate claims must be independently examined to determine whether they are justiciable under the political question doctrine. In Count 1 of the Complaint, Plaintiffs assert that HB 2

> violates Sections 2 and 6 of the Kentucky Constitution by creating districts that reflect extreme partisan gerrymandering that will result in the election of a House of Representatives that does not fairly and truthfully reflect the will of the citizens of the Commonwealth of Kentucky, thereby depriving those citizens of a free and equal election.

Plaintiffs likewise argue SB 3 violates the guarantee of a free and equal election through excessive partisan gerrymandering.

While touching on Section 2, these allegations center on Section 6, which guarantees "[a]ll elections shall be free and equal."[10] KY. Const. § 6. Our predecessor Court developed extensive jurisprudence articulating the appropriate standard to adjudicate the claimed deprivation of a free and equal election. *Hatcher v. Meredith*, 295 Ky. 194, 173 S.W.2d 665 (1943); *Karloftis v. Helton*, 297 Ky. 463, 178 S.W.2d 959 (1944); *Booth v. McKenzie*, 302 Ky. 215, 194 S.W.2d 63 (1946); and *Rosenberg v. Republican Party of Louisville & Jefferson County*, 270 S.W.2d 171 (Ky. 1954).

Further, in Count 2, Plaintiffs allege

HB 2 violates Section 33 of the Kentucky Constitution by its excessive splitting of several of Kentucky's most populous counties into more districts than are necessary to comply with applicable Constitutional mandates.

---

[10] This section of the Kentucky Constitution does not have an analogue in the U.S. Constitution.

53

Again, as noted by the majority, Section 33 and our caselaw mandate specific requirements which must be satisfied for a redistricting map to pass muster under the Kentucky Constitution.

Thus, I concur with the majority that Count 1 and Count 2 of the Complaint are clearly justiciable controversies, with both having particularized standards and rules to guide judicial review. Though justiciable, however, I further agree with the majority that both are foreclosed on the merits, that is to say: neither HB 2 nor SB 3 infringe the Plaintiffs' right to a free and equal election under Section 6; and HB 2 does not violate the requirements of Section 33 as interpreted in *Fischer*, 879 S.W.2d at 479.

However, I part ways with the majority on the justiciability of the Plaintiffs' remaining allegations. In Count 3, Plaintiffs contend:

> The partisan gerrymandering reflected in HB 2 and SB 3 violates the guarantee of equal protection contained in Sections 1, 2, and 3 of Kentucky's Constitution because the Commonwealth has no legitimate interest—let alone a compelling one—in diminishing the electoral power of Kentucky's Democratic voters and depriving them of the right to vote on equal terms with Republican voters.

The scope of equal protection under the Kentucky Constitution is equivalent to that of the Fourteenth Amendment of the Federal Constitution. *See Commonwealth ex rel. Stumbo v. Crutchfield*, 157 S.W.3d 621, 624 (Ky. 2005). In *Rucho*, the Supreme Court held similar equal protection claims involving partisan gerrymandering present a non-justiciable political question. 139 S.Ct. at 2499.

Equal protection claims relating to partisan gerrymandering "rest on an instinct that groups with a certain level of political support should enjoy a

54

commensurate level of political power and influence." *Id.* "Explicitly or implicitly, a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate statewide support into seats in the legislature." *Id.* However, "such a claim is based on a 'norm that does not exist' in our electoral system—'statewide elections for representatives along party lines.'" *Id.* The Supreme Court further explained:

> Unable to claim that the Constitution requires proportional representation outright, plaintiffs inevitably ask the courts to make their own political judgment about how much representation particular political parties deserve—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end. But federal courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so.
>
> . . . .
>
> Deciding among . . . different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is "fair" in this context would be an "unmoored determination" of the sort characteristic of a political question beyond the competence of the federal courts.

*Id.* at 2499-500.

Contrary to claims involving a violation of the one-person, one-vote principle, "the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly." *Id.* at 2501. "It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide

55

support." *Id.* In other words, the Constitution contains no requirement "that each party must be influential in proportion to its number of supporters." *Id.* Because this reasoning applies equally to the present appeal, the Plaintiffs' equal protection claims should have been dismissed as a non-justiciable political question.

In Count 4, Plaintiffs claim HB 2 and SB 3 violate their rights of free speech and assembly under Sections 1(4) and (6) of the Kentucky Constitution. Specifically, Plaintiffs allege "HB 2 and SB 3 burden Democratic voters' right to free expression by making their votes less effective[.]" Additionally, Plaintiffs assert that their free assembly rights are burdened because the redistricting maps "severely limit the ability of Democratic voters to apply to their representatives and obtain redress on important issues," and "inhibit [the Kentucky Democratic Party's] ability to solicit campaign donations and make campaign expenditures by requiring the party to raise and spend more money to be competitive in elections than would be required under non-partisan redistricting plans." Further, Plaintiffs argue HB 2 and SB 3 constitute unconstitutional viewpoint discrimination because they "single out Democratic voters because of their past voting history and intentionally pair them with more Republican areas specifically to dilute their voting power."

The freedoms of speech and assembly under the Kentucky Constitution are co-extensive with the First Amendment of the United States Constitution. *See Blue Movies, Inc. v. Louisville/Jefferson Cnty Metro Gov't,* 317 S.W.3d 23, 29 (Ky. 2010) (rejecting Pennsylvania Supreme Court's expansive interpretation

56

of free speech provision of Pennsylvania Constitution).  As the majority

recognizes, "[t]o begin, there are no restrictions on speech, association, or any

other First Amendment activities in the districting plans at issue.  The plaintiffs

are free to engage in those activities no matter what the effect of a plan may be

on their district." *Rucho*, 139 S.Ct. at 2504.  The Supreme Court further

explained:

> The plaintiffs' argument is that partisanship in districting should
> be regarded as simple discrimination against supporters of the
> opposing party on the basis of political viewpoint.  Under that
> theory, any level of partisanship in districting would constitute an
> infringement of their First Amendment rights.  But as the Court
> has explained, "[i]t would be idle ... to contend that any political
> consideration taken into account in fashioning a reapportionment
> plan is sufficient to invalidate it."  The First Amendment test
> simply describes the act of districting for partisan advantage.  It
> provides no standard for determining when partisan activity goes
> too far.

*Id.*  Ultimately, "the First Amendment analysis . . . offers no 'clear' and

'manageable' way of distinguishing permissible from impermissible partisan

motivation." *Id.* at 2505.  Because this reasoning applies with equal force to

the present appeal, the Plaintiffs' free speech and assembly claims should have

been dismissed as a non-justiciable political question.

> In Count 5, Plaintiffs allege

> HB 2 and SB 3 violate [the] right to be free from arbitrary and
> absolute power because they make the will of the voters of
> Kentucky subservient to the desire of the Republican
> supermajority to be re-elected, in perpetuity.

Plaintiffs additionally contend that "SB 3 also represents an arbitrary exercise

of absolute power to favor two incumbent U.S. House members," and "[t]hose

57

central Kentucky counties have interests far different than the rest of the Western Kentucky counties they are now paired with in District 1."

Kentucky courts have long interpreted the scope of Section 2 consistently with federal equal protection and due process protections. *See Williams v. Wedding,* 165 Ky. 361, 176 S.W. 1176, 1184 (1915) (interpreting Section 2 in connection with equal protection clause of Fourteenth Amendment to the U.S. Constitution); and *Transp. Cabinet v. Cassity,* 912 S.W.2d 48, 51 (Ky. 1995) (applying standard set forth by *Mathews v. Eldridge,* 424 U.S. 319 (1976), to procedural due process claims under Section 2); *see also* John David Dyche, *Section 2 of the Kentucky Constitution - Where Did It Come From And What Does It Mean,* 18 N. Ky. L. Rev. 503 (1991) (detailing the historical and legal development of Section 2). Admittedly, in a pre-*Sexton* decision, our predecessor Court (without specifically citing Section 2) viewed arbitrariness, at least in theory, as an independent constitutional safeguard against which congressional redistricting could be measured. *Carter,* 355 S.W.2d at 658. In practice, however, the sheer extent of deference our courts have traditionally extended to the legislature in matters of redistricting begs the question of whether any conceivable map would ever be so extreme as to warrant judicial intervention. Such an "I know it when I see it" approach to partisan gerrymandering is a "plainly unsatisfactory" guide to judicial decision-making. *See Gormley v. Judicial Conduct Comm'n,* 332 S.W.3d 717, 728 (Ky. 2010). In other words, the language of Section 2 continues to "cr[y] out for a standard to guide its use and application." *See Commonwealth Nat. Res. & Environmental*

58

*Protection Cab. v. Kentec Coal Co., Inc.*, 177 S.W.3d 718, 741 (Ky. 2005) (Roach, J., dissenting).

In *Carter*, our predecessor Court summarily discounted, as "considerations purely esthetic," claims that a "geographic monstrosity" of a congressional redistricting was arbitrary. 355 S.W.3d at 658, 659. Most notably, in *Richardson v. McChesney*, 128 Ky. 363, 108 S.W. 322, 323 (1908), our predecessor Court shattered the illusion that Section 2 provides any meaningful limitation upon legislative authority with regards to congressional redistricting by bluntly stating, "we are of the opinion that it is not within the power of the courts to control the legislative department in the creation of congressional districts." The Court explained:

> There is no mention of congressional districts in the Constitution of the state; nor is there in that instrument any direction to the General Assembly as to how the districts shall be laid off. In the matter of dividing the state into congressional districts the Legislature, at least so far as the power and authority of this court extends, is supreme. This court has no control over its action. It would be exceeding the power granted us to undertake to revise or annul a legislative act relating to a subject over which the Legislature has absolute control.

> If, in the matter of dividing the state into congressional districts, this court should undertake to declare invalid the division made by the legislative department, it would simply result in setting up our judgment against the judgment of the members elected for the purpose of performing this duty. We would be putting up our opinion against those in whom the exclusive right to regulate this matter has been lodged, and be arrogating to ourselves wisdom, honesty, and fairness superior to those charged by law with the control of these matters.

*Id.* The Court contrasted the lack of authority to review congressional redistricting with its ability to strike down a redistricting plan enacted in violation of Section 33:

> And so, when the General Assembly in the division of the state into senatorial and legislative districts grossly violated that provision of the Constitution directing that the districts should be "as nearly equal in population as may be," we exercised the power vested in the judiciary to protect from invasion by whatever source the fundamental law of the state, and declared the act invalid. *Ragland v. Anderson*, 100 S.W. 865, 30 Ky. Law Rep. 1199. But in the matter of congressional districts we find nothing in our state Constitution to guide us. There is nowhere any limitation upon the power of the Legislature, and it would be assuming authority this court does not possess if we undertook to control a coordinate department of the government in the performance of a power vested exclusively in it.

*Id.*

The majority's reliance on *City of Lebanon v. Goodin,* 436 S.W.3d 505 (Ky. 2014), to support a finding of justiciability under Section 2 in the present context is misplaced. *Goodin* involved a straightforward "challeng[e] [to] the constitutionality" of a city's actions in performing a nonconsensual annexation of private property pursuant to KRS 81A.420. *Id.* at 510. After refusing to inquire into the city's subjective motives in annexing the property at issue, we held

> the City's decision to annex the selected territory is rationally connected to its power to act. . . . *And the City fully complied with the statute governing the selection of territory for annexation.* So the City's annexation did not violate Goodin's rights under Section 2 of the Kentucky Constitution.

*Id.* at 519 (emphasis added).

60

By contrast, in the present appeal, there are no constitutional or statutory provisions to guide our judicial determination of whether a congressional redistricting map is arbitrary as a partisan gerrymander. Similarly, our precedents refuse to recognize claims of partisan unfairness in determining whether a legislative redistricting complies with the requirements of Section 33. *Jensen*, 959 S.W.2d at 776 ("[T]he mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm.").

The reasoning of the *Richardson* and *Jensen* decisions resonate with that of the Supreme Court in *Rucho*. Given this history and our modern interpretation of Section 2 as an amalgam of equal protection and due process principles, I would dispense with the fiction that Section 2 provides a coherent standard to adjudicate claims of partisan gerrymandering. Otherwise, our decision may "serv[e] almost exclusively as an invitation to litigation without much prospect of redress." *Vieth*, 541 U.S. at 279 (citing S. Issacharoff, P. Karlan, & R. Pildes, *The Law of Democracy* 886 (Rev. 2d ed. 2002)). Thus, Plaintiffs' claims under this Section should also be relegated to the political arena.

The majority opinion posits a well-intentioned but infirm legal standard which Kentucky's long-established precedent demonstrates will likely never be found to have been met, because no legislative deviation will ever be found to be so clear, so flagrant, so unwarranted, so severe—so extreme—to justify

61

judicial intervention into the purely political quagmire of gerrymandering. *See Jensen*, 959 S.W.2d at 776; *Carter*, 355 S.W.2d at 658; and *Richardson*, 108 S.W. at 323. As such, the majority's ostensible standard undermines and defangs itself by remaining "*inherently*, and therefore, *permanently*," uncertain. *See Crawford v. Washington*, 541 U.S. 36, 68 n.10 (2004). Professor Williams has wisely observed if state courts

> are to be expected to police the redistricting process to guard against partisan gerrymandering and other redistricting abuses, the legal framework for such review must be sufficiently robust to enable that type of searching review. Otherwise, . . . the confidence placed in state courts will prove misplaced, and the hope that partisan gamesmanship can be constrained through judicial review will be dashed.

Williams, 106 Marq. L. Rev. at 952. I consider Professor Williams's warning prescient.

Rather than presuming jurisdiction and claiming possession of an effective prescription, the better course would be to admit political gerrymandering—though a chronic disease infecting the health of our democracy—remains resistant to judicial cure for lack of Constitutional textual authority and any definitive framework of guiding rules and standards. Until existing Constitutional and statutory boundaries are reformed—by demand of the people, if need be—there are few clear lines over which the legislative bodies may be judicially precluded from crossing.

Nevertheless, in representing the rich history, distinctive culture, and proud people of far western Kentucky, I am compelled to comment on the First Congressional District established under SB 3. To borrow the descriptive word

62

enlisted by the trial court, the newly established First Congressional District "bizarrely" spans over 350 miles from the Jackson Purchase, Pennyrile, and Western Coalfield regions of Western Kentucky to the heart of the Inner Bluegrass region.

Admittedly, legislative expansion of the First Congressional District beyond its traditional far western borders commenced in full force in the early 1990's. And certainly, adherence to traditional cultural and geographical boundaries will not necessarily preclude the intrusion of political mischief. *Rucho,* 139 S.Ct. at 2500. However, as the trial court explicitly found in the present case, "it is clear from the record that SB 3 is a partisan gerrymander aimed at diluting the Democratic vote share by creating an uncompact First District based on rationale that was not applied across all districts." A comparison of the erratic and wide-ranging shapes of the six statewide Congressional districts established in SB 3 with the more compact, contiguous, and complementary configuration of the seven Supreme Court districts contemporaneously established under HB 179[11] further supports the trial court's determination.

_____

[11] Although HB 179 is not in dispute and Section 110(4) of the Kentucky Constitution contains specific requirements for the creation of Supreme Court Districts, comparison between the maps is appropriate because the parties stipulated that all materials on the Legislative Research Commission's website are admissible. Inconsistencies apparent from such a comparison support the trial court's suggestion that conflicting rationales were being applied. 2022 Redistricting Maps, Kentucky General Assembly (last visited Dec. 13, 2023), [https://legislature.ky.gov/Public%20Services/GIS/Maps/Pages/2022-Redistricting-Maps.aspx].

Opportunistic political gerrymandering places the self-serving and corrupting motivations and interests of party and person over the common and beneficent perspectives and concerns attached to the history, culture, and people of place. Absent robust public debate, forthright explanation, media discovery, or access to courts to lift the veil of secrecy, the people of Kentucky's diverse regions are left to speculate as to any obscured or nuanced factors trusted elected Legislative representatives might have reasonably weighed when otherwise seeming to have laid the heritage and concerns of the people's place at the foot of apparent political and personal expediency. Within the fabric of our democracy, however, and especially in those limited instances, as here, when courts can offer no recourse or remedy, it is the people who must ultimately stand to hold their elected Legislative representatives to account. In such cases, I am reminded of the wisdom once expressed by U.S. Supreme Court Justice Louis Brandeis, of Kentucky, who observed in a 1913 *Harper's Weekly* article, "Sunlight is said to be the best of disinfectants."

To be clear, my determination that the gerrymandered redistricting maps present non-justiciable causes of actions is neither to condone them or discount the reality of their impacts on the integrity of our political process. However, while I share the majority's fealty to our judicial duty, I do not agree that Kentucky law contains any neutral and principled standards enabling courts to adjudicate political gerrymandering claims beyond those established by specific provisions of our Constitution and related statutes. Because "the function of the courts [is] to provide relief, not hope[,]" I do not believe this

Court should bestow a constitutional imprimatur upon a purely partisan enterprise by subverting our exclusive power of judicial review with a half-hearted deference to the legislature. *Vieth*, 541 U.S. at 304. Further, by feinting at our ability "to afford help when [we] in fact can give none, it deters the political process from affording genuine relief." *Id.*

In conclusion, as our predecessor Court recognized in 1908, my position does not leave the people without a remedy for the pernicious impacts related to partisan redistricting, should they desire to pursue one:

> The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fails, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights.

*Richardson*, 108 S.W. at 24. Therefore, I would affirm the denial of Plaintiffs' claims under Sections 6 and 33 on the merits and dismiss the remaining claims as non-justiciable political questions.

**KELLER, J., CONCURRING IN PART, DISSENTING IN PART:** I concur with much of the Majority's well-written Opinion. However, I must respectfully dissent from its holding regarding Section 33 of the Constitution of this great Commonwealth. Section 33, states, in full, as follows:

> The first General Assembly after the adoption of this Constitution shall divide the State into thirty-eight Senatorial Districts, and one hundred Representative Districts, as **nearly equal in population** as may be **without dividing any county**, except where a county may include more than one district, which districts shall constitute the Senatorial and Representative Districts for ten years. **Not more than two counties shall be joined together** to form a Representative District: Provided, In doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated. At the expiration of that time, the General

65

Assembly shall then, and every ten years thereafter, redistrict the State according to this rule, and for the purposes expressed in this section. If, in making said districts, inequality of population should be unavoidable, any advantage resulting therefrom shall be given to districts having the largest territory. **No part of a county shall be added** to another county to make a district, and the counties forming a district shall be **contiguous**.

KY. CONST. § 33 (emphasis added). The language of this section "is uncomplicated and leads immediately to the conclusion that as between the competing concepts of population equality and county integrity, the latter is of **at least equal importance**." *Fischer v. State Bd. of Elections*, 879 S.W.2d 475, 477 (Ky. 1994) (*Fischer II*) (emphasis added).

And yet, since *Fischer II*, this Court has neglected to give credence to each and every one of the directives our Constitution provides to both preserve county integrity and prevent partisan gerrymandering throughout the redistricting process. Today, the Majority of this Court reaffirms our repeated dilution of Section 33's explicit requirements. I respectfully dissent in that I interpret Section 33 to require an equal balancing of all of its county integrity requirements against the constitutional requirement of population equality and would find HB 2 unconstitutional, in that respect only.

In *Fischer II*, this Court considered **only** whether splitting an unnecessary number of counties rendered a reapportionment scheme unconstitutional. In the 30 years that have followed, this Court has conflated the concept of preserving "county integrity" with the practice of splitting the least number of counties. *See Jensen v. Ky. State Bd. of Elections*, 959 S.W.2d 771, 774–75 (Ky. 1997); *Legis. Rsch. Com'n v. Fischer*, 366 S.W.3d 905, 912

66

(Ky. 2012). Such an interpretation places too much emphasis on *Fischer II*'s dual mandate at the expense of Section 33's other directives and therefore at expense of the people of our Commonwealth. As the author of *Fischer II*, Justice Lambert wrote later in *Jensen*: "*Fischer II* must be read in light of the issues before the Court." 959 S.W.2d at 777 (Lambert, J., dissenting).

Along with population equality and dividing the fewest counties, Section 33 also requires that, as far as possible, no more than two counties should be joined to form a Representative District and no part of a county should be added to another county to form a district. These explicit constitutional requirements have not been accounted for in a meaningful way since *Fischer II*, and today, the Majority of this Court announces that the legislature may continue to disregard them except where its actions "clearly and flagrantly" violate the spirit of Section 33.

To be clear, HB 2 complies with what has become known as *Fischer II*'s dual mandate: it maintains population equality to within plus-or-minus 5% from the ideal population of a legislative district and divides the fewest number of counties possible. However, HB 2 does little else to comply with the rest of Section 33 and protect county integrity. HB 2 split those 23 divided counties a total of 80 times. HB 191, on the other hand, was able to achieve population equality to within plus-or-minus 5% while splitting those 23 divided counties only 60 total times. Dr. Kosuke Imai's simulated plans, on average, also split those 23 divided counties fewer times than did HB 2.

67

Additionally, regarding county splitting, HB 2 contained 18 counties that were split multiple times (meaning, the county contained 3 or more districts). Under Dr. Imai's simulated plans, on average only 15 counties were split multiple times, with a range of 13 to 17 counties.

Regarding Section 33's directive that no more than two counties should be joined to form a Representative District, HB 2 had 31 districts that contained more than two counties. HB 191 only had 23 districts that contained more than two counties. Dr. Imai's simulated plans on average had 24 districts that contained more than two counties, with a range of 21 to 30 districts.

Finally, regarding Section 33's directive that no part of a county should be added to another county to form a district, HB 2 took a portion of a county and joined it with a neighboring county to form a district 45 times while HB 191 only did this 31 times.

As can be seen, HB 2 violates several of Section 33's mandates more times than is necessary. That reality is readily apparent in Kenton County, which was unnecessarily carved into 6 districts, and portions of which were joined with 4 other neighboring counties. HB 191 would have divided Kenton County into just 5 districts, and joined it with only 2 neighboring counties. The same can be said for Pike County, which was unnecessarily split 3 times into 4 districts, all of which are joined to 4 neighboring counties. In fact, Pike County has no district that resides entirely within its county lines. Under HB 191, Pike County would be split into just 2 districts, only one of which adjoined to another county.

Perhaps some unnecessary deviations from Section 33's text are constitutionally tolerable, but I am of the opinion that the violations before us today rise to intolerable levels when all of Section 33's text is given proper consideration and weight. The Majority's well-reasoned analysis, relying on this Court's prior caselaw is not unfounded, yet it relegates many of Section 33's requirements to second-class status—something not contemplated by *Fischer II* or the framers of our Constitution. "Section 33 of the Constitution of Kentucky is our responsibility and we should defend it," even when our predecessors have not. *Jensen*, 959 S.W.2d at 778 (Lambert, J., dissenting). To permit the legislature to continue to ignore the text of Section 33 is to erase meaningful language from our Constitution—something I am not willing to do.

The importance of defending all of the mandates contained in Section 33 is best explained by the framers of the 1891 Constitution who intended the section to check against gerrymandering. Bennett Young, a representative from Louisville, explained that the people of other states where gerrymandering occurred were "robbed of their representation." KY. CONST. DEB. Vol. 3, p. 3984. He stated, "[I]t has been a byword and a stench in the nostrils of every free man in this country. We do not want that in Kentucky." *Id.*

In closing, I am reminded of this Court's predecessor's strong statement in *Ragland v. Anderson*, and I urge the General Assembly to take heed of it when drafting redistricting plans:

> That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to

69

exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied.

100 S.W. 865, 869 (Ky. 1907).

Because I cannot ignore the plain language of a duly-enacted section of our Commonwealth's Constitution that I took an oath to support, I must respectfully dissent, in part.

**CONLEY, J., DISSENTING:** I agree with much of the Court's analysis that holds there was no violation of Appellants' rights under Sections 1, 2, 3, 6, and 33 of the Kentucky Constitution. I dissent because I disagree that the Appellants had standing to bring such claims in the first place.

With our adoption of the federal constitutional standards in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564-65 (1992), a "plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Ward v. Westerfield*, 653 S.W.3d 48, 51 (Ky. 2022). In 2018, the Supreme Court of the United States, applying the *Lujan* standards, held voters had not established standing to bring a claim of partisan gerrymandering. *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). The question of justiciability of a partisan gerrymandering claim aside, if we are to remain consistent with our adoption of the *Lujan* standing requirements then *Whitford* is applicable and controlling as to standing in this case.

A person's right to vote is individual and personal, and where one can show that right has been disadvantaged as an individual voter, one has

70

standing to sue. *Id.* at 1929. In *Whitford*, the plaintiffs brought a partisan gerrymandering claim under packing and cracking theories—either that districts were "packed" with democrats giving them a supermajority in one district or "cracked" by spreading democrat votes so thin they could not reasonably expect to ever win an electoral majority. *Id.* at 1930. The claims here are no different in principle because they too must somehow allege voter dilution; but they are even less cogent than a cracking or packing theory. All the Appellants challenge SB 3 by alleging Franklin County should not be in the First Congressional District because Franklin County is not socio-economically similar to the rest of the First Congressional District. In other words, that their votes are diluted because Franklin County will have less influence in the First Congressional District because it is different. The Appellants challenge HB 2 because of voter dilution based on statistical projections pretending to predict how many seats the GOP or Democratic party will win versus what they should win under "more proportional" and ostensibly neutral district maps. All of these claims have been rejected by the Supreme Court under *Lujan*, therefore should be rejected by this Court as well. *Id.* at 1931; 1933.

Three of the plaintiffs—Smith, Smith-Willis, and Collins—did not testify at trial. The trial court found their standing solely based on their pleadings in the complaint that they were voters, citizens, taxpayers, and residents of Franklin County. "The facts necessary to establish standing, however, must not only be alleged at the pleading stage, but also proved at trial." *Id.* at 1931. The

failure to prove standing with evidence at trial is enough to dismiss these Appellants.

The trial court found Derrick Graham had sustained an injury because SB 3 and HB 2 had intentionally diluted "the power of Democratic votes to impact Democratic recruitment, fundraising, policy, and negotiations." The trial court found Jill Robinson had sustained an injury because SB 3 intentionally diluted "the power of her vote and other Democratic electors which interferes with her interest in translating her vote into fair representation." Robinson did not claim to have an injury by HB 2. It should be obvious that these are not concrete, particularized, and actual injuries to Graham or Robinson *as individual voters*. They are injuries to institutional and collective interests of the democratic party. The trial court explicitly referenced other people and the democratic party in its holdings. How is that particularized? Graham's injuries are entirely about money, political power, and political influence. Robinson's injury is predicated on her ability, as a democratic activist, to influence her congressional representative. How is that concrete? Collective representation in the General Assembly and political power/influence—whether that be in the legislature or in the townhall with your congressman—do not present "an individual and personal injury of the kind required for Article III standing." *Id.* at 1931.

Finally, there is the Kentucky Democratic Party. The KDP does not have first party standing because its claim that SB 3 and HB 2 injure its ability to fundraise, recruit candidates, or influence policymaking is based on "a loss of

72

political power, not [a] loss of any private right, which would make the injury more concrete." *Raines v. Byrd*, 521 U.S. 811, 821 (1997); *Whitford*, 138 S. Ct. at 1931. The KDP does not have associational standing either. In *City of Pikeville v. Ky. Concealed Carry Coalition, Inc.,* this Court identified the three traditional prongs of associational standing: (1) the association's members could have sued in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) the claim asserted and relief requested do not require the participation of individual members of the association. 671 S.W.3d 258, 264 (Ky. 2023).

The trial court found all three prongs satisfied but that ruling was erroneous as to the first and third prong. "An association must specifically identify the member whose alleged injury the association seeks to vindicate through judicial proceedings." *Id.* at 265. As demonstrated above, neither Graham (the specific person the trial court identified as proving the KDP had satisfied the first prong for associational standing) nor Robinson have standing in their own right. Neither have demonstrated a concrete, particularized, and actual injury to their selves as voters. Thus, there is no specific member of the KDP identified who has a cognizable injury under *Lujan*—without this it "'cannot hope to achieve associational standing.'" *Id.* at 266 (quoting *Commonwealth ex rel. Brown v. Interactive Media Ent. & Gaming Ass'n, Inc.*, 306 S.W.3d 32, 38 (Ky. 2010)).

The KDP does not satisfy the third element of associational standing for one very simple reason—it is not a voter. As the Supreme Court has made

73

clear: a claim of voter dilution, even under the umbrella of partisan gerrymandering, is a personal right of an individual voter. *Whitford*, 138 S. Ct. at 1929. The KDP has no right to vote in elections whatsoever. Therefore, it cannot bring a claim regarding voter dilution because such a claim depends on an individual voter having their vote treated unequally. The KDP's claim requires the participation of an individual member.

I understand the Court's desire to reaffirm its (quite limited) constitutional role in districting cases. But we have spent the last five years since our decision in *Commonwealth v. Sexton*, 566 S.W.3d 185, 188 (Ky. 2018), reaffirming time and again that *Lujan* standing is law and an indispensable constitutional prerequisite for the judiciary to act. *City of Pikeville*, 671 S.W.3d at 263. We have not hesitated to bring it up *sua sponte*. *Id.* at 262. We have not hesitated to reaffirm it even when faced with a challenge to a constitutional amendment. *Ward v. Westerfield*, 653 S.W.3d 48 (Ky. 2022). We have not hesitated to cast away old case law that could not square with *Sexton* and *Lujan. Id.* at 54. Indeed, we have not hesitated to reaffirm it even when confronted with the most intensely political issue in America in the last fifty years. *Cameron v. EMW Women's Surgical Center, P.S.C.*, 664 S.W.3d 663 (Ky. 2023) (partially rejecting first and third party standing to bring challenge to abortion statutes).

This case is no different. As Justice Henry Baldwin once said, the judiciary's constitutional authority is "not like those of the other departments of the government . . . ." *Ex Parte Crane*, 30 U.S. 190, 222 (1831) (Baldwin, J.,

dissenting). For us, the power to act and the duty to act "are inseparable: whenever a case calls for it, the call is imperative." *Id.* The converse is equally true—when there is no duty to act, there is no power to act. And we have declared these past five years that injury—particularized, concrete, and actual, to the individual plaintiff invoking this Court's jurisdiction—is at the heart of our authority to act. *Sexton*, 566 S.W.3d at 193-97. As the claims of the Appellants and conclusions of the trial court reveal, this "is a case about group political interests, not individual legal rights. But this Court is not responsible for vindicating generalized partisan preferences. The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Whitford*, 138 S. Ct. at 1933.

Because I conclude the Appellants have no standing, I would reverse the trial court and dismiss this case.

COUNSEL FOR APPELLANTS/CROSS-APPELLEES, DERRICK GRAHAM, JILL ROBINSON, JOSEPH SMITH; KATIMA SMITH-WILLIS, KENTUCKY DEMOCRATIC PARTY, AND MARY LYNN COLLINS:

Michael P. Abate
Casey L. Hinkle
William R. ("Rick") Adams
Kaplan Johnson Abate & Bird LLP


COUNSEL FOR APPELLEE/CROSS-APPELLANT, COMMONWEALTH OF KENTUCKY:

Victor B. Maddox
Deputy Attorney General

Matthew F. Kuhn
Solicitor General

Heather L. Becker
Executive Director

Alexander Y. Magera
Assistant Solicitor General

COUNSEL FOR APPELLEE/CROSS-APPELLEE, SECRETARY OF STATE MICHAEL ADAMS:

Michael Adams
Secretary of State

Jennifer Scutchfield
Michael R. Wilson

COUNSEL FOR APPELLEE/CROSS-APPELLEE, KENTUCKY STATE BOARD OF ELECTIONS:

Taylor Austin Brown

COUNSEL FOR AMICUS CURIAE, PROFESSOR JOSHUA A. DOUGLAS:

Kevin C. Burke
Jamie K. Neal
Burke Neal PLLC

Derek S. Clinger
State Democracy Research Initiative
at the University of Wisconsin Law School


COUNSEL FOR AMICI CURIAE, NRCC, REPUBLICAN NATIONAL COMMITTEE, AND REPUBLICAN PARTY OF KENTUCKY:

Philip J. Strach
Thomas A. Farr
Shaina D. Massie
Nelson Mullins Riley & Scarborough LLP


COUNSEL FOR AMICI CURIAE, SPEAKER OF THE HOUSE DAVID W. OSBORNE AND SENATE PRESIDENT ROBERT STIVERS:

D. Eric Lycan
Office of Speaker of the House

David E. Fleenor
Office of the Senate President


COUNSEL FOR AMICI CURIAE, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, BLACK LIVES MATTER LOUISVILLE, AND KENTUCKY EQUAL JUSTICE CENTER:

Corey M. Shapiro
Kevin Muench
American Civil Liberties Union of Kentucky Foundation

Kelsey A. Miller
Ming Cheung
Adriel I. Cepeda Derieux
Sophia Lin Lakin
Crystal Fryman
Julie A. Murray
American Civil Liberties Union Foundation, Inc.

COUNSEL FOR AMICUS CURIAE, CAMPAIGN LEGAL CENTER:

Michele Henry
Craig Henry PLC

Mark P. Gaber
Hayden Johnson
Benjamin Phillips
Campaign Legal Center


COUNSEL FOR AMICUS CURIAE, HONEST ELECTIONS PROJECT:

James M. Yoder
Todd & Todd PLLC

Tyler R. Green
Cameron T. Norris
Conor D. Woodfin
Consovoy McCarthy PLLC


COUNSEL FOR AMICUS CURIAE, PUBLIC INTEREST LEGAL FOUNDATION:

Mark H. Metcalf
Garrard County Attorney

Charlotte M. Davis
Public Interest Legal Foundation


COUNSEL FOR AMICUS CURIAE, THE NATIONAL REPUBLICAN
REDISTRICTING TRUST:

Andrew D. Watkins
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC